UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
FRANCARL REALTY CORPORATION,
VIKING STAR, INC., VIKING STARSHIP, INC.,
VIKING QUEST, INC., VIKING GOOD
TIMES, INC., PAUL G. FORSBERG, SR.,
HANK LACKNER, GEORGE SHIMINSKI,
WILLIAM J. MODICA, STRETTLE F.
WHITTING, and WILLIAM GRIMM,

                       Plaintiffs,                     05-cv-1792
                                                     (SJF)(WDW)
     -against-

                                                       **OPINION & ORDER**

THE TOWN OF EAST HAMPTON,

                       Defendant.
-----------------------------------------------------------X
FEUERSTEIN, J.

I.     Introduction

       This action was commenced by Francarl Realty Corporation ("Francarl"), Viking Star, Inc., Viking Starship, Inc., Viking Quest, Inc., Viking Good Times, Inc. (collectively, "Viking Plaintiffs"), Paul G. Forsberg, Sr., Hank Lackner, George Shiminski, William J. Modica, Strettle F. Whitting and William Grimm (collectively, "Individual Plaintiffs") against the Town of East Hampton ("East Hampton" or "Defendant") seeking a declaration that Local Law No. 40 of 1997 of the Town of East Hampton (the "Ferry Law") is invalid. According to Plaintiffs, the Ferry Law violates the Dormant Commerce Clause and the Equal Protection Clause of the United States Constitution; constitutes an improper and <u>ultra vires</u> exercise of East Hampton's zoning power; and is an impermissible regulation of business details under New York law. Plaintiffs have moved for partial summary judgment, and Defendant has cross-moved for summary

1

judgment. For the reasons set forth below, Defendant's cross-motion for summary judgment is granted, and Plaintiffs' motion for partial summary judgment is denied.

II. Background

Suffolk County (the "County") is the easternmost county on Long Island, separated from Connecticut on the north by Long Island Sound and bordered on the west by Nassau County.[1] Suffolk County consists of one-thousand (1,000) square miles. It is eighty-six (86) miles long, east to west, and at its widest and most westerly point is twenty-six (26) miles, north to south. The County divides into two "forks" in the Town of Riverhead. The northern fork, (the "North Fork"), contains, inter alia, the Town of Southold, which is comprised of, inter alia, the Villages of Greenport and Orient Point.

The southern fork, (the "South Fork"), contains, inter alia, the defendant Town of East Hampton. East Hampton is, in turn, comprised of the Village of East Hampton, a portion of the Village of Sag Harbor and a number of unincorporated hamlets, including Montauk. East Hampton is twenty-two (22) miles long and its width, north to south, ranges from three-quarters (3/4) of a mile to six (6) miles. The main east to west artery, Montauk Highway, provides one traffic lane in each direction. Located between the North and South Forks is an island, the Town of Shelter Island.

Francarl owns and operates a ferry terminal located on commercial waterfront property in the hamlet of Montauk in the eastern portion of the Town of East Hampton (the "Ferry Terminal"). (Pl/Def. 56.1 Stmt. ¶ 7; Def/Pl. 56.1 Stmt. ¶ 1). Francarl has operated the Ferry Terminal "serving vessels engaged in interstate commerce and travel since approximately 1954."

---

[1] This Court may take judicial notice of geography. Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 556 (2d Cir. 2000). All distances and travel times are approximate.

(Pl/Def. 56.1 Stmt. ¶ 9). The Viking Plaintiffs provide seasonal ferry service between the Ferry Terminal and "various points and places outside of New York State, including but not limited to New London, Connecticut; Block Island, Rhode Island; and Martha's Vineyard, Massachusetts." (Cmplt. ¶ 11). The Individual Plaintiffs are "individuals residing in East Hampton who own automobiles and/or who use those automobiles to travel between East Hampton and various places outside New York, including but not limited to Connecticut, Rhode Island, Massachusetts, and other places in New England." (Pl/Def. 56.1 Stmt. ¶ 3).

Although the Viking Plaintiffs' ferry service is the only ferry operating to and from East Hampton, (id.; Ans. ¶ 11), travel between Connecticut and East Hampton can also be effected by vehicular ferry from Bridgeport, Connecticut to Port Jefferson, and driving to East Hampton (sixty-five and one-half (65.5) miles). According to its website, non-party Cross Sound Ferry, Inc. ("CSF")[2] also provides vehicular and passenger ferry service between Orient Point on the North Fork and New London, Connecticut. (www.longislandferry.com).[3] Passengers utilizing the CSF service who wish to proceed south to East Hampton from Orient Point may drive or take a bus or train six (6) miles west to Greenport, take a ferry to the Town of Shelter Island (fifteen (15) minutes), drive (five (5) miles) to the southern end of the Town of Shelter Island and take a ferry to Sag Harbor (five (5) minutes), which straddles the border between the western end of

---

[2] CSF, seeking to commence its own ferry service to and from East Hampton, filed a lawsuit in this Court in 2004 seeking a declaration that the Ferry Law was unconstitutional. Town of Southold v. Town of E. Hampton, 406 F. Supp. 2d 227 (E.D.N.Y. 2005). My decision in that case, which rejected Cross Sound Ferry's challenge, is currently on appeal before the United States Court of Appeals for the Second Circuit.

[3] This Court may take judicial notice of the contents of a website assuming, as in this case, its authenticity has not been challenged and "it is capable of accurate and ready determination." Fed. R. Evid. 201; see also Hotel Emples. & Rest. Emples. Union, Local 100 v. City of N.Y. Dep't of Parks & Rec., 311 F.3d 534, 549 (2d Cir. 2002); Boone v. Menifee, 387 F. Supp. 2d 338, 343 n. 4 (S.D.N.Y. 2005) (adopted in full at 2005 U.S. Dist. LEXIS 20005 (S.D.N.Y., Sep. 13, 2005)).

East Hampton and the eastern end of the Town of Southampton. Shelter Island ferry service is provided by non-parties North Ferry Co. (Greenport - Shelter Island) and South Ferry Inc. (Shelter Island - Sag Harbor). (www.northferry.com; www.southferry.com). Travel to East Hampton can also be effected by rail, plane or bus from New York City. (www.easthampton.com/other/transportation.html).

Beginning in 1966 officials on the eastern end of Long Island recognized burgeoning transportation problems in the region. Myriad studies, reports and conferences confirmed what residents already knew: inadequate roads and an increasing population were creating escalating traffic congestion in the area, particularly in the summer months. (See, e.g., Cahn Aff., Exs. 6-14).

Studies contemplating the growth of the eastern end of Long Island and potential traffic and land use concerns were commissioned by different entities and agencies, including the New York State Department of Transportation, which issued the South Fork Transportation Study in 1986. (Cahn Aff., Ex. 9). Other studies followed. All of the studies recognized and sought solutions to the area's increasing transportation and traffic congestion. (See, e.g., Cahn Aff., Ex. 51 (Twomey Aff. ¶ 2); Cahn Aff., Ex. 11). A 1990 "Ferry Access Study" commissioned by the County cited Shorham-Wading River as the only suitable site for additional ferry service from New England. (Cahn Aff., Ex. 17). All of the studies recognized the increasing population, worsening traffic congestion and the lack of viable vehicular alternatives in light of the dearth of roads in the area which could accommodate, or be made to accommodate, the traffic load. In 1995, East Hampton commissioned the Amagansett Corridor Study. The draft study, published in 1997, recommended restricting both building and land use in East Hampton. (Cahn Aff., Ex. 12).

In August 1995, Catherine Lester, then a Councilwoman of East Hampton, issued a memorandum to the Town Board recommending the commission of a Town transportation plan.[4] Pending the issuance of the proposed plan and consideration of the plan by the Board, Councilwoman Lester recommended a moratorium on all ferry service and terminal applications. (Cahn Aff., Ex. 51 (Lester Aff. ¶ 2; Cahn Aff., Ex. 18).

The moratorium was adopted on October 24, 1995. (Cahn. Aff., Ex. 22). An engineering consulting firm, L.K. McLean Associates, was commissioned to draft the Comprehensive Plan which had been suggested by Councilwoman Lester in her August 1995 memorandum to the Board. The resulting Plan contained a "Transportation Element" which recommended against institution of additional ferry service. (Cahn Aff., Ex. 51 (Di Biaisi Aff. ¶ 8); Cahn Aff., Ex. 14). Public hearings were held, culminating in the adoption of the "Transportation Element" of the Town's Comprehensive Plan on August 21, 1997. (Cahn Aff., Ex. 13).

Following the issuance of all necessary agency approvals, the Ferry Law was adopted, becoming operative on January 13, 1998. (Cahn Aff., Ex. 36).

The Ferry Law states, inter alia:

A. Special Permit required. No person shall construct, commence to use, or substantially expand a passenger ferry terminal, nor commence any passenger ferry service, without having first obtained a special permit pursuant to Article V hereof which specifically authorizes the proposed use and approves the onshore terminal facility to be employed.

B. Vessel limitations. No ferry which has more than two thousand (2,000) installed horsepower and the capability of travelling at a speed in excess of twenty (20) knots, nor any vehicle ferry of any description, shall dock at or otherwise make use of any passenger ferry terminal, or be allowed to dock at or make use of such facility, except in case of emergency.

---

[4]The memorandum may have been triggered by news releases of CSF's institution of high-speed service without approval in the Town of Southold.

5

The Ferry Law also "defined the capacity of passenger ferries serving East Hampton." (Pl/Def. 56.1 Stmt. ¶ 52). Pursuant to this authority, "the Town's Chief Building Inspector determined the total capacity of the Viking Ferries operating from Francarl's ferry terminal was 644 persons per day." (Id. ¶ 53). After several appeals to the Town Zoning Board of Appeals and a 1999 amendment to the Ferry Law, (Cahn Aff., Ex. 38), the East Hampton Chief Building Inspector and, <u>inter alia</u>, the Viking Plaintiffs entered into a "written settlement stipulation in which they agreed to be bound by the Inspector's determination that the ferry passenger capacity of the Viking Ferries [operating out of the Ferry Terminal] is a total of 1342 persons per 24 hour day." (Pl/Def. 56.1 Stmt. ¶ 59). This action was commenced on April 11, 2005.

III.   Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material "if it might affect the outcome of the suit under the governing law." <u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 69 (2d Cir. 2001). An issue of fact is genuine only if a jury could reasonably find in favor of the nonmoving party based on that fact. <u>Id.</u> The moving party bears the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to establish the existence of a factual question that must be resolved at trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986). The trial court is required to construe the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor. <u>Id.</u> at 252; <u>Cifarelli v. Vill. of Babylon</u>, 93 F.3d 47, 51 (2d Cir. 1996).

IV. Analysis

    A.    Dormant Commerce Clause

The Commerce Clause of the United States Constitution grants Congress the authority to "regulate Commerce . . . among the several States . . . ." Article I, § 8, cl. 3. The Supreme Court has long held that the clause contains both an affirmative grant of power and a "further, negative command, known as the dormant Commerce Clause . . . that prevents a State from . . . placing burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." Am. Trucking Ass'ns v. Mich. PSC, 545 U.S. 429, __, 125 S. Ct. 2419, 2422 (2005) (quotations and citations omitted). In application, a law can run afoul of the dormant Commerce Clause in two ways:

> First, a statute that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid per se and can survive only if the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism. Second, if the statute does not discriminate against interstate commerce, it will nevertheless be invalidated under the Pike balancing test if it imposes a burden on interstate commerce incommensurate with the local benefits secured.

Grand River Enterprises Six Nations, Ltd. v. Pryor ("Grand River"), 425 F.3d 158, 168 (2d Cir. 2005) (quoting Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d Cir. 2004) (quotations omitted)).[5]

    1.    Discrimination Against Interstate Commerce

A statute improperly discriminates against interstate commerce "only if it accords differential treatment to in-state and out-of-state economic interests that benefits the former and

---

[5] The Supreme Court has also struck down state laws that regulate commerce wholly outside the borders of the state. See, e.g., Healy v. Beer Inst., 491 U.S. 324 (1989). These cases are inapplicable to the instant dispute as the Ferry Law clearly does not regulate conduct wholly outside of New York.

7

burdens the latter." Grand River, 425 F.3d at 168 (quoting Or. Waste Sys., Inc. v. Dep't of Envtl. Quality, 511 U.S. 93, 99 (1994) (quotations omitted)). A plaintiff challenging a statute as clearly discriminatory must therefore "identify [an] in-state commercial interest that is favored, directly or indirectly, by the [law] at the expense of out-of-state competitors." Freedom Holdings, 357 F.3d at 218. "The party challenging the validity of a statute bears the burden of showing that it is discriminatory." Brown & Williamson Tobacco Corp. v. Pataki, 320 F.3d 200, 209 (2d Cir. 2003); see also Harvey & Harvey, Inc. v. County of Chester et al., 68 F.3d 788, 802 (3d Cir. 1995) (citing Hughes v. Oklahoma, 441 U.S. 322, 336 (1979)); Shapiro v. Cooke, 552 F. Supp. 581, 588 (N.D.N.Y. 1982). If the plaintiff is able to demonstrate discrimination, "the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." Brown & Williamson Tobacco Corp., 320 F.3d at 209.

Plaintiffs have failed to identify any intrastate economic interest that is favored by the Ferry Law. Although they contend that the Ferry Law's "Findings and Objectives" are evidence of East Hampton's discriminatory intent (See, e.g., Pl. Mem. in Supp. at 13), and the "Findings and Objectives" note "the popularity of very large casinos established on the Connecticut mainland . . . which has greatly increased ferry traffic . . . [,]" (Ferry Law, Findings and Objectives, § I), the purpose of the Ferry Law is not to prohibit interstate travel. Rather, as stated in the very first sentence of the Findings and Objectives, the Ferry Law was a response to "congestion on the Town's highways [that] has become an increasingly serious threat to public health and safety and to the economic vitality and general livability of the Town." (Id.) The stated purpose of the law, to protect against increased traffic and ensure the health, safety and

economic vitality of East Hampton, is confirmed by the fact that the Ferry Law bans <u>all</u> vehicular and high-speed ferries, and not just those serving Connecticut and New England.

Notwithstanding the clear applicability of the Ferry Law to both intrastate and interstate ferry operators, Plaintiffs claim that the stated purposes, including traffic reduction, are pretexts for the true "discriminatory purpose" of the Ferry Law. (Pl. Mem. in Supp. at 14). For example, Plaintiffs cite to the Ferry Law's "omission of any analysis of Fast and/or Vehicle Ferry use by Viking and Francarl – the only ferry service in Town." (Pl. Mem. in Supp. at 14). According to Plaintiffs,

> [n]either the Transportation Element nor the Ferry Law evaluate whether any adverse traffic consequences would occur if the same number of people that the Viking Ferries are authorized to transport to and from the Town each day arrive by Fast Ferry and/or Vehicle Ferry, instead of by slow ferry. Nor does the Transportation Element or the Ferry Law consider the effect on traffic congestion if shuttle buses and other proposed amelioration measures are coordinated with the transportation by ferry of the 1342 persons per day the Viking Plaintiffs and Francarl are authorized to transport in interstate commerce.

(Pl. Mem. in Supp. at 14). Similarly, Plaintiffs claim, inter alia, that the Ferry Law does not consider the seasonal nature of the traffic it seeks to control, and that limited high speed ferry service to Montauk would, in fact, ameliorate traffic congestion. (See, e.g., Pl. Mem. in Supp. at 4; Pl. Mem. in Opp. at 15-19). These arguments, never raised by the Plaintiffs at the hearings prior to adoption of the Ferry Law in the 1990's, are in any event without merit. The 'per se' test applies to laws that "clearly discriminate[] against interstate commerce in favor of intrastate commerce . . . ." <u>Grand River</u>, 425 F.3d at 168 (citations and quotations omitted). Plaintiffs, who bear the burden of demonstrating discrimination, have offered only unsupported speculation

9

that the true purpose of the Ferry Law was to discriminate against interstate commerce.[6] Plaintiffs argue, <u>inter alia</u>, that the Ferry Law contemplated, and was passed to counteract, vehicular and/or high speed ferry service on a much larger scale than the Viking Plaintiffs can offer. Similarly, Plaintiffs argue that a high speed or vehicular Viking ferry service to and from East Hampton would, in fact, ameliorate traffic problems. However, as Defendant correctly notes, "[t]he Ferry Law is a law of general application . . . ." (Def. Reply Mem. at 11), and Plaintiffs' unsubstantiated claim to have identified a hypothetical alternative means of restricting, or even improving traffic while allowing the Viking Plaintiffs to operate vehicular and/or high speed ferries does not render the Ferry Law unconstitutional. See <u>Exxon Corp. v. Maryland</u>, 437 U.S. 117, 126 (1978) ("The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce.")

Furthermore, Plaintiffs' claim that the Ferry Law is a 'border blocking' law, as in <u>City of Philadelphia v. New Jersey</u>, 437 U.S. 617 (1978), is without merit. The plaintiffs in <u>City of Philadelphia</u> successfully challenged a New Jersey law that "prohibit[ed] the importation of most 'solid or liquid waste which originated or was collected outside the territorial limits of the State . . . .'" <u>Id.</u> at 618 (quoting N.J. Stat. Ann. § 13:1*I*-10 (1978). Crucial to the Court's decision in <u>City of Philadelphia</u> was the fact that the challenged law distinguished between interstate and intrastate waste.

---

[6]For example, Plaintiffs claim that the Transportation Element restricts ferry service (which allegedly caters to interstate travelers) while proposing improvements "in bus service, train service, establishment of local shuttles, and numerous other improvements that favor intrastate commerce . . . ." (Pl. Mem. in Opp. at 2). According to Plaintiffs, this demonstrates a preference for intrastate commerce. However, this claim, too, is belied by the fact that the Ferry Law applies equally to both interstate and intrastate ferries.

> New Jersey may [protect against environmental damage] by slowing the flow of *all* waste into the States' remaining landfills, even though interstate commerce may incidentally be affected. But whatever New Jersey's ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently .... [However, t]here is no basis to distinguish out-of-state waste from domestic waste. If one is inherently harmful, so is the other. Yet New Jersey has banned the former while leaving its landfill sites open to the latter. The New Jersey law blocks the importation of waste in an obvious effort to saddle those outside the State with the entire burden of slowing the flow of refuse into New Jersey's remaining landfill sites. That legislative effort is clearly impermissible under the Commerce Clause of the Constitution.

City of Philadelphia, 437 U.S. 626-27, 629 (emphasis in original). Unlike the invalid restriction in City of Philadelphia, the Ferry Law applies to both interstate and intrastate ferries. Thus, Plaintiffs cannot demonstrate "discriminat[ion] against articles of commerce coming from outside the State ...." Id. at 626-27. Plaintiffs have failed to satisfy their burden of demonstrating discrimination against interstate commerce, and the per se test therefore does not apply.

In addition to failing to demonstrate discrimination, Plaintiffs' unsupported claim that a high speed or vehicular ferry service would improve traffic overlooks several key facts including, inter alia, that a ferry utilizing the Montauk terminal might attract passengers bound for New England from areas west of East Hampton, thereby drawing additional cars and traffic into and through East Hampton. As to passengers bound for Long Island, Plaintiffs concede that approximately thirty-five (35) to forty (40) percent of arriving Orient Point ferry passengers have South Fork destinations, and note that seventy-five (75) percent of these passengers are destined for the Town of Southampton. (Pl. Mem. in Opp. at 17) (citing Cahn Aff., Ex. 17). Plaintiffs claim that a Montauk-based ferry would ameliorate traffic because, at present, the "remaining 25% are now forced to drive into the Town [of East Hampton] from the west," (Pl. Mem. in Opp.

11

at 17), whereas a Montauk-based ferry would mean that "[t]hose users would not drive further east into the Town." (Pl. Mem. in Opp. at 17). Plaintiffs' argument ignores the fact that, inter alia, the Southampton-bound ferry passengers from New England might switch to a Montauk-based ferry, thereby drawing traffic to Southampton and through East Hampton.

      2.    <u>Pike</u> Balancing Test

In <u>Pike v. Bruce Church, Inc.</u>, 397 U.S. 137 (1970), the Supreme Court established a balancing test "applicable to nondiscriminatory state legislation affecting interstate commerce." <u>Grand River</u>, 425 F.3d at 169. A nondiscriminatory law

> will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

<u>Pike</u>, 397 U.S. at 142. In this Circuit, the test entails a three part analysis: "(1) the nature of the local benefits advanced by the statute; (2) the burden placed on interstate commerce by the statute; and (3) whether the burden is clearly excessive when weighed against these local benefits." <u>Grand River</u>, 425 F.3d at 169 (quotations omitted). "This balancing test, however, does not invite courts to second-guess legislatures by estimating the probable costs and benefits of the statute, nor is it within the competency of courts to do so." <u>Brown & Williamson Tobacco Corp.</u>, 320 F.3d at 209.

Plaintiffs argue that the Ferry Law places an excessive burden on interstate commerce when weighed against any local benefits. Plaintiffs contend, without any supporting evidence, that a Viking vehicular and/or high speed ferry would not increase, and might actually decrease

traffic and that therefore, any local benefits are minimal in comparison to the burdens on interstate commerce. Plaintiffs also argue that "courts must consider the possible cumulative effects if other jurisdictions passed similar laws," (Pl. Mem. in Supp. at 18) (citing C&A Carbone Inc. v. Town of Clarkstown, N.Y., 511 U.S. 383, 406 (1994), and "[i]n this case, the cumulative effect of many or all municipalities enacting an outright ban on Fast and Vehicle Ferries would be a total ban on such travel throughout New York, Long Island, and even the United States." (Pl. Mem. in Supp. at 19). Plaintiffs claim that "[s]uch a result could bring entire travel routes in the region and around the nation to a halt," (id.), and that "[i]t is impossible to conceive of any local benefit which could justify such a total prohibition on these forms of interstate commerce." (Id.). Furthermore, Plaintiffs argue that "there is not a scintilla of evidence to establish any local benefit from banning Fast Ferries and Vehicle Ferries during the non-summer months." (Id.).

The Ferry Law survives a Pike balancing analysis. First, it was clearly enacted to further a legitimate local purpose: the promotion of the health and safety of East Hampton's residents. See Grand River, 425 F.3d at 169 (holding "public health" to be a legitimate local benefit). Plaintiffs have offered no evidence in support of the claim that a Viking high speed and/or vehicular ferry service would decrease traffic. As to Plaintiffs' claim that the defendant town does not have year-round traffic congestion, they have failed to provide evidence of traffic patterns in the "off-season months," and concede that there are perhaps only three (3) months per year when traffic might not be a consideration. Furthermore, it is unclear how many patrons, if any, will be interested in vehicular and high speed interstate ferry travel in the coldest months of the year. Nor has Francarl declared that it would be willing to operate such a service only during these months. As to the second prong, Plaintiffs have failed to identify or offer evidence of any

"qualitatively different burden on interstate commerce than on intrastate commerce . . . ." Id. at 170. Finally, in light of the other available travel alternatives available to and from East Hampton, including the existing ferry service operated by the Viking Plaintiffs and vehicular ferry service to other points on Long Island, any burden placed on interstate commerce is minimal.

Plaintiffs' claim that the Ferry Law "impose[s] regulatory burdens outside the Town [of East Hampton] for which the Town is not politically accountable . . ." is also without merit. (Pl. Mem. in Supp. at 20). According to Plaintiffs, the Ferry Law "impose[s] an undue burden on interstate commerce," (id.), because, inter alia, it "deprive[s] non-residents from political redress or voice in the Town's policies." (Id.). Plaintiffs' argument is without merit. The Ferry Law applies to entities seeking to provide ferry service to and from East Hampton, and the fact that it may affect individuals or entities outside of East Hampton does not render it unconstitutional. Plaintiffs' claims are therefore without merit.

B. Equal Protection Clause

Plaintiffs also claim that the Ferry Law violates the Equal Protection Clause of the federal Constitution by improperly infringing upon the Individual Plaintiffs' and the Viking Plaintiffs' customers' fundamental right to travel. Accordingly, Plaintiffs argue that the Ferry Law is subject to a strict scrutiny analysis. Defendant argues that "[t]here is no constitutionally-protected right to the provision of direct ferry service, via a specific type of ferry, to East Hampton." (Def. Resp. Mem. at 19). Therefore, Defendant claims, the Ferry Law should be analyzed under rational basis review, which it claims the Ferry Law survives.

1. Standard of Review

The first step in evaluating the merits of an Equal Protection claim is to determine the level of review under which the challenged law will be evaluated. Attorney Gen. of New York v. Soto-Lopez, 476 U.S. 898, 906 (1986); Ramos v. Town of Vernon, 353 F.3d 171, 174 (2d Cir. 2003). "It is well established that where a law classifies by race, alienage, or national origin, and where a law classifies in such a way as to infringe constitutionally protected fundamental rights, heightened scrutiny under the Equal Protection Clause is required." Soto-Lopez, 476 U.S. at 906 (citations and quotations omitted); see also Ramos, 353 F.3d at 175 (citing Plyler v. Doe, 457 U.S. 202, 216-17 (1982)).

It is beyond dispute that the Fourteenth Amendment guarantees a fundamental right to travel. Soto-Lopez, 476 U.S. at 901; Saenz v. Roe, 526 U.S. 489, 498 (1999). "A state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right." Soto-Lopez, 476 U.S. at 903 (citations and quotations omitted). However, the Ferry Law will only be reviewed under strict scrutiny if Plaintiffs can demonstrate that the Ferry Law (1) actually deters travel, or (2) impedes travel as its primary objective, or (3) uses any classification which penalizes the exercise of that right. Id.

Plaintiffs argue that "[b]y completely banning Vehicle Ferries and Fast Ferries, the Ferry Bans clearly actually deter such forms of travel." (Pl. Mem. in Supp. at 22) (internal quotations and brackets omitted). Plaintiffs' claim is without merit, and contrary to established caselaw. A statute does not interfere with the right to travel, as protected by the federal Constitution, unless it places an "unreasonabl[e] burden" on interstate travel. Saenz, 526 U.S. at 499. As the Fifth Circuit explained in Cramer v. Skinner, 931 F.2d 1020, 1031 (5th Cir. 1991), "travelers do not have a constitutional right to the most convenient form of travel. Minor restrictions on travel

15

simply do not amount to the denial of a fundamental right that can be upheld only if the Government has a compelling justification." (citing Soto-Lopez, 476 U.S. at 903); see also Doe v. Moore, 410 F.3d 1337, 1348 (11th Cir. 2005) ("mere burdens on a person's ability to travel from state to state are not necessarily a violation of their right to travel.") (citing Saenz, 526 U.S. at 499). Although the Ferry Law may arguably make travel to and from East Hampton less convenient, it does not infringe upon the fundamental right to travel.

Plaintiffs also argue that "impeding travel is the primary objective and purpose of the Ferry Bans." (Pl. Mem. in Supp. at 22). However, as noted above, the stated purpose of the law was to protect against increased traffic and ensure the health, safety and economic vitality of East Hampton, and Plaintiffs have failed to demonstrate pretext.

Based upon the foregoing, the Ferry Law is subject to review under a rational basis standard.

2. Application

In order to survive rational basis review, a challenged statute need only be "rationally related to a legitimate state interest." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985). Under this analysis, "[i]f there is any reasonably conceivable state of facts that could provide a rational basis for believing" that the law is rationally related to a legitimate interest, then "it is not so arbitrary as to fail the constitutional test." Zalewska v. County of Sullivan, 316 F.3d 314, 322 (2d Cir. 2003) (quoting Heller v. Doe, 509 U.S. 312, 320 (1993)) (quotation marks omitted). The grounds on which the law is sustained need not be the grounds identified by the legislature in passing the law. Jankowski-Burczyk v. INS, 291 F.3d 172, 178 (2d Cir. 2002) (citing FCC v. Beach Communications, 508 U.S. 307, 320 (1993)). As the Second Circuit has stated,

> the government has no obligation to produce evidence to sustain the rationality of a statutory classification. We will assume that a statute is constitutional and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record.

Able v. United States, 155 F.3d 628, 632 (2d Cir. 1998) (quotations and citations omitted).

It is well established that a state or subdivision may pass laws to "protect the health, safety, and welfare of [its] citizens." Gonzales v. Raich, 545 U.S. 1, __, 125 S. Ct. 2195, 2213 (2005). Therefore, if there is "any reasonably conceivable state of facts that could provide a rational basis for believing" that the Ferry Law is rationally related to these goals, it will pass Constitutional muster. Zalewska, 316 F.3d at 322. Because there exists a rational basis for believing that a law restricting the flow of traffic is rationally related to protecting the health, safety and welfare of the citizens of East Hampton, the Ferry Law does not violate the Equal Protection Clause.

C.  Zoning Power

Plaintiffs claim that the Ferry Law is an ultra vires exercise of East Hampton's zoning powers. (Pl. Mem. in Supp. at 24). At the time the Ferry Law was passed, in 1997, New York Town Law § 130 authorized towns in the state of New York to enact laws

> [r]egulating the speed and regulating and restricting the operation of vessels and, in the counties of Westchester, Saratoga, Warren and Suffolk the size and horse power of inboard and outboard motors, while being operated or driven upon any waters within or bounding the town to a distance of fifteen hundred feet from the shore except that in Nassau and Suffolk counties, towns may regulate and restrict the speed and regulate and restrict the operation of vessels in all tidal waters upon lands within the geographic boundaries of such town and those tidal waters contiguous with the town to a distance of fifteen hundred feet from shore and not within any other town.

N.Y. Town Law § 130(17)(1)(a) (1997). The towns of New York were also authorized to enact laws "[r]estricting and regulating the anchoring or mooring of vessels in any waters within or

17

bounding the town to a distance of fifteen hundred feet from the shore." N.Y. Town Law §
130(17)(1)(b) (1997).

A challenge to a legislative judgement resulting in regulatory legislation is "restricted to
the issue whether any state of facts either known or which could reasonably be assumed affords
support for it." United States v. Carolene Products Co., 304 U.S. 144, 153-54 (1938); see also
De Sena v. Gulde, 24 A.D.2d 165, 171 (2d Dep't 1965) (cited at Louhal Props. v. Strada, 191
Misc. 2d 746, 751 (Sup. Ct. Nassau Co. 2002), aff'd, 307 A.D.2d 1029 (2d Dep't 2003)). A
zoning regulation will generally be upheld if it "relat[es] either to the use of land or to the
potential impact of land use on neighboring properties." Louhal Props., 191 Misc. 2d at 751.
The Ferry Law, which "regulate[s] and restrict[s] the operation of vessels," N.Y. Town Law §
130(17)(1)(b) (1997), was passed to combat traffic and related environmental problems. This
relates to the use of land or the potential impact of land use on neighboring properties, and the
Ferry Law is therefore a proper exercise of East Hampton's zoning power.[7]

---

[7] Plaintiffs also claim for the first time in their reply brief that the Ferry Law is preempted by federal law. Plaintiffs did not make any such allegation in their complaint. Furthermore, it is well established that "[a]rguments raised for the first time in a party's reply brief should not be a basis for relief." Silverman v. Apker, 05 Civ. 6682 (JGK), 2006 U.S. Dist. LEXIS 23406, at *6 (S.D.N.Y., Apr. 19, 2006); see also Martin v. Gantner, 05-cv-2157 (ILG), 2006 U.S. Dist. LEXIS 54270, at *12 n. 5 (E.D.N.Y., Aug. 4, 2006) (refusing to consider arguments raised for the first time in a reply brief) (citing Evangelista v. Ashcroft, 359 F.3d 145, 155 n. 4 (2d Cir. 2004)). In light of Plaintiffs' failure to timely raise this argument, as well as the dearth of both evidence and sufficient briefing relevant to this issue, Plaintiffs' motion for summary judgment on preemption grounds is denied.

V.  Conclusion

For the reasons set forth above, Defendant's cross-motion for summary judgment is GRANTED, and Plaintiffs' motion for summary judgment is DENIED. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

/s/
Sandra J. Feuerstein
United States District Judge

Dated: September 14, 2006
Central Islip, New York

To:

Steven Barshov
Sive, Paget & Reisel, P.C.
460 Park Avenue
10th Floor
New York, NY 10022-1906


Michael B. Gerrard
Arnold & Porter, LLP
399 Park Avenue
New York, NY 10022


Richard C. Cahn
Cahn & Cahn, LLP
445 Broadhollow Road
Suite 332
Melville, NY 11747-9034