UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



————————————————————————X

FRANCARL REALTY CORPORATION,
VIKING STAR, INC., VIKING STARSHIP, INC.,
VIKING QUEST, INC., VIKING GOOD TIMES,
INC., PAUL G. FORSBERG, SR., HANK LACKNER,
GEORGE SHIMINSKI, WILLIAM J. MODICA,
STRETTLE F. WHITTING, and WILLIAM GRIMM,

                    Plaintiffs,

              -against-                        **OPINION & ORDER**
                                               05-CV-1792 (SJF) (WDW)
THE TOWN OF EAST HAMPTON,

                    Defendant.

————————————————————————X

FEUERSTEIN, J.

I.      Introduction


        Suffolk County, New York (the "County") is the easternmost county on Long Island,

separated from Connecticut on the north by Long Island Sound and bordered on the west by

Nassau County.[1]  The County divides into two "forks" in the Town of Riverhead.  Located

between the two forks is an island, the Town of Shelter Island.

        The northern fork, (the "North Fork"), contains, *inter alia*, the Town of Southold, which

is comprised of, *inter alia*, the Villages of Greenport and Orient Point.

        The southern fork, (the "South Fork"), contains, *inter alia*, the Defendant Town of East

———————————————————————

        [1] This Court may take judicial notice of geography.  Hartford Fire Ins. Co. v. Orient
Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 556 (2d Cir. 2000).  All distances and travel
times are approximate.

Hampton ("Town" or "Defendant"), which is comprised of the Village of East Hampton, a portion of the Village of Sag Harbor and a number of unincorporated hamlets, including Montauk, the easternmost area of the Town. The Town is twenty-two (22) miles long and its width, north to south, ranges from three-quarters (3/4) of a mile to six (6) miles. East Hampton is bounded to the South by the Atlantic Ocean; to the North by Gardiner's Bay, Long Island Sound, and Block Island Sound; and to the East by the Atlantic Ocean and Block Island Sound. The main east to west artery, Montauk Highway or Route 27, provides one (1) traffic lane in each direction.

Plaintiff Francarl Realty Corporation ("Francarl") owns and operates a ferry terminal ("Ferry Terminal") located on commercial waterfront property in the hamlet of Montauk. Francarl also owns the abutting land, which it utilizes as a parking area.

Viking Star, Viking Starship Inc., Viking Quest, Inc., and Viking Good Times, Inc. (collectively "Viking") own, operate and manage the vessels Viking Star, Viking Starship, Viking Starliner, and Royal Casino I ("Viking Ferries"), respectively. Viking provides passenger ferry service between the Ferry Terminal, and "various points and places outside of New York State, including but not limited to New London, Connecticut; Block Island, Rhode Island; and Martha's Vineyard, Massachusetts." (Compl. ¶ 11.)

Plaintiff Paul Paul G. Forsberg, Sr. is the principal of both Francarl and Viking (collectively with Mr. Forsberg, "Plaintiff").[2]

---

[2] The claims of plaintiffs William J. Modica, Strettle F. Whitting and William Grimm were dismissed by Order dated September 14, 2006 ("September 2006 Order"), therefore, they are no longer plaintiffs in this action. See Francarl Realty Corp. v. Town of E. Hampton, No. 05 Civ. 1792, 2006 WL 4449577, at *9-10 (E.D.N.Y. Sept. 14, 2006).

Although Viking's ferry service is the only ferry service operating to and from East Hampton, travel between Connecticut and East Hampton can also be effected between Bridgeport, Connecticut and Port Jefferson by the passenger-vehicle ferry of the non-party Bridgeport-Port Jefferson Steamboat Company, (see www.bpjferry.com).[3] A bus[4] or car may be taken between East Hampton and Port Jefferson, a distance of sixty-five and one-half (65.5) miles.

Non-party Cross Sound Ferry Services ("CSF") also provides vehicle and passenger ferry service between Orient Point on the North Fork and New London, Connecticut. (See www.longislandferry.com.) Passengers utilizing the CSF service who wish to proceed south to East Hampton from Orient Point may drive or take a bus or train six (6) miles west to Greenport, take a ferry to the Town of Shelter Island (fifteen (15) minutes), drive (five (5) miles) to the southern end of the Town of Shelter Island and take a ferry to Sag Harbor (five (5) minutes), which straddles the border between the western end of East Hampton and the eastern end of the Town of Southampton. Shelter Island ferry service is provided by non-parties North Ferry Co. (Greenport-Shelter Island) and South Ferry Inc. (Shelter Island-Sag Harbor). (See www.northferry.com; www.southferry.com.)

Travel to East Hampton can also be effected by rail, plane or bus from New York City.

---

[3] This Court may take judicial notice of the contents of a website assuming, as in this case, its authenticity has not been challenged and it is "capable of accurate and ready determination." Fed. R. Evid. 201(b)(2); see also Hotel Employees & Rest. Employers Union, Local 100 v. City of N.Y. Dep't of Parks & Rec, 311 F.3d 534, 549 (2d Cir. 2002) (citations omitted).

[4] The Hampton Jitney website, (www.hamptonjitney.com), advertizes bus service between Southampton and the Port Jefferson Ferry Terminal.

(See www.easthampton.com/other/transportation.html.)

Beginning in 1966 officials on the eastern end of Long Island recognized burgeoning transportation problems in the region. Myriad studies, reports and conferences confirmed that inadequate roads and an increasing population were creating escalating traffic congestion in the area, particularly in the summer months.

Studies contemplating the growth of the eastern end of Long Island, potential traffic and land use concerns were commissioned by different entities and agencies, including the New York State Department of Transportation, which issued the South Fork Transportation Study in 1986. (See Joint Trial Exhibits ("Ex.") at 4.) Other studies followed, (see Exs. 1, 2, 3, 80, 81, 82, 86), all of which recognized the area's increasing traffic congestion, increasing population and the dearth of roads in the area which could accommodate, or be made to accommodate, the traffic load. A 1990 "Ferry Access Study" commissioned by Suffolk County cited Shorham-Wading River as the only suitable site for additional ferry service from New England. (Ex. 29.) In 1995, East Hampton commissioned the Amagansett Corridor Study. (Ex. 79.) The draft study, published in 1997, recommended restricting both building and land use in East Hampton.

In 1995, L.K. McLean Associates, an engineering consulting firm, was commissioned by the Town to draft the Town's Comprehensive Transportation Plan. A moratorium on all ferry service and ferry terminal applications was adopted on October 24, 1995 pending the issuance of the proposed plan and consideration of the plan by the Town Board. The resulting Comprehensive Transportation Plan contained a Transportation Element (the "Transportation Element") which recommended, *inter alia*, against institution of increased or additional ferry service. (Ex. 84.) Public hearings were held, culminating in the adoption of the Transportation

4

Element of the Town's Comprehensive Plan on August 21, 1997.

Local Law No. 40 of 1997 (the "Ferry Law")[5] was adopted, becoming operative on

January 13, 1998. The Town Code Definitions include, *inter alia*:

> EXCURSION BOAT - A vessel used on a commercial basis to take passengers to sea from any port or place within the Town of East Hampton and which returns those passengers to the point of origin without an intervening stop at any port or other land not located in the Town. As used herein, the term 'to sea' shall mean into any harbor, bay or other waters within or adjoining the Town of East Hampton, including the Atlantic Ocean. This term shall include a vessel employed on a commercial basis for party-fishing trips (commonly called a 'party boat'), a vessel used for sight-seeing trips or tours (e.g., a whale-watching boat), a dinner cruise vessel or a vessel employed on gambling trips outside the territorial waters of the State of New York. Compare 'ferry.' [Added 12-18-1997 by L.L. No. 40-1997]

> FERRY – A vessel used in the business of carrying passengers between any port or place in the Town of East Hampton and any other port or place without the Town. Compare 'excursion boat.' [Added 12-18-1997 by L.L. No. 40-1997]

> EXPANSION, SUBSTANTIAL [Amended 10-16-1987 by L.L. No. 15-1987; 11-15-1996 by L.L. No. 19-1996]:

> * * *

> B.   Use. A substantial expansion of a use shall be deemed to occur in either of the following circumstances:

> * * *

> C.   Passenger ferry terminals. In addition to the other provisions of this subsection regarding substantial expansion of structures or uses, a substantial expansion of a passenger ferry terminal shall be deemed to result from any increase in ferry passenger capacity, as defined in this chapter. Such increase shall be regarded as a substantial expansion regardless of its magnitude and regardless of whether it is due to an increase in the number of ferries using the terminal, the replacement of one ferry with another having a larger capacity, an increase in the capacity of an existing ferry, an increase in the number of ferry trips daily or other cause. [Added 12-18-1997 by L.L. No. 40-1997]

---

[5] The Ferry Law amended various sections of the Code of the Town of East Hampton (the "Town Code").

FERRY PASSENGER CAPACITY - The number of persons which a vessel used as a ferry may lawfully carry as passengers, under the rules and regulations of the United States Coast Guard or <u>other regulating authority then in effect</u>. (emphasis added) As applied to a passenger ferry terminal, this term shall mean the maximum number of passengers which could have departed from the terminal on publicly scheduled trips under a 'best-day' condition. Ferry passenger capacity for a ferry terminal under a 'best-day' condition shall be calculated as follows: (1) determine the passenger capacity of any ferry departing from the terminal on a given calendar day (midnight to midnight); (2) multiply this passenger capacity by the number of departures made by that ferry from the terminal on that day; and (3) add to this number the products of (1) times (2) for every other ferry departing from the terminal on that same day. The use of this formula shall be subject to the following provisos: [Added 12-18-1997 by L.L. No. 40-1997; amended 2-9-1999 by L.L. No. 6-1999]

A.    The day used in making this calculation shall be that which yields the highest number for the terminal's ferry passenger capacity (i.e., the 'best day' in terms of the potential number of ferry passengers departing the terminal on publicly scheduled trips).

B.    <u>Each ferry</u> whose departure is used in making this calculation <u>shall be a ferry which regularly docks at or uses the ferry terminal</u>. (emphasis added)

C.    Each departure used in making this calculation shall be a bona fide ferry departure open to the public and shown on the ferry terminal's published sailing schedule.

Town Code, Art. I, General Provisions, § 255-1-20, Definitions.

The Uses and Dimensions section of the Town Code states, *inter alia*:

FERRY TERMINAL, PASSENGER [Added 12-18-1997 by L.L. No. 40-1997]:

(1) Special Permit required. No person shall construct, commence to use, or substantially expand a passenger ferry terminal nor commence any passenger ferry service without having first obtained a special permit pursuant to Article V hereof which specifically authorizes the proposed use and approves the onshore terminal facility to be employed.

(2) Vessel limitations. No ferry which has more than two-thousand installed horsepower and the capability of traveling at a speed in excess of 20 knots, nor any vehicle ferry of any description shall dock at or otherwise make use of any passenger ferry terminal or be allowed to dock at or make use of such facility, except in case of emergency.

Town Code, Art. XI, Uses and Dimensions, § 255-11-88, Additional Rules for Particular Principal and Accessory Uses.

The Special Permit section of the Town Code states, *inter alia*:

FERRY TERMINAL, PASSENGER [Added 12-18-1997 by L.L. No. 40-1997]:

(1)     No special permit shall be issued hereunder unless the Planning Board shall find and determine that the passenger ferry service to be accommodated by the proposed passenger ferry terminal will not result in either of the following adverse effects:

    (a)     A significant increase in overall traffic volume on the streets of the Town; or

    (b)     An increase in traffic volume along any portion of a state road, county road or other collector street or an increase in traffic volume at the intersection of a state road, county road or other collector street with another state road, county road or collector street, such that traffic flow on that road segment or at that intersection would be degraded by an amount equivalent to a reduction in the level of service of the road segment or intersection by one full grade. For the purpose of applying this standard, 'level of service' shall have the meaning ascribed to it in the Highway Capacity Manual prepared by the Transportation Research Board of the National Research Council.

(2)     The site shall be of adequate size to accommodate an improved parking area capable of handling pickup and delivery of passengers as well as areas for long-term parking, all of which areas are large enough for the peak number of passengers anticipated to use the terminal.

(3)     In order to assist the Planning Board in making the determinations required by Subsections (1) and (2) hereof, every application for a special permit hereunder shall state a maximum ferry passenger capacity for the terminal.   The Planning Board shall use this capacity in evaluating the eligibility of the proposed use for a special permit and may set a lower maximum capacity as a condition of any special permit which it issues if the Board believes this is necessary to ensure compliance with the provisions of this chapter.  Any special permit actually issued by the Planning Board <u>shall impose a maximum ferry passenger capacity</u> for the terminal.  Said capacity shall not be increased unless a new special permit has first been issued therefor.  (emphasis added)

(4)     The limitations on vessel horsepower and capable speed which are found in Subsection (1) of the subsection entitled 'Passenger Ferry Terminal,' in § 255-11-88 of this Code shall be expressly included as a condition of any special permit issued hereunder.

(5)     The site shall be provided with public rest rooms.

Town Code, Art. V, Special Permit Uses, § 255-5-50, Specific Standards and Safeguards.

In 1999 Plaintiff commenced a state court proceeding against the Town alleging that its ferry passenger capacity ("FPC") had been incorrectly calculated by the Town.

That lawsuit was settled by a stipulation of settlement (the "1999 Stipulation") in which the parties agreed to be bound by the Town Inspector's determination that the total FPC of the Viking Ferries operating from the Montauk Ferry Terminal is one thousand three hundred forty-two (1342) persons per day.

II.     Procedural History

On September 8, 2004, the Towns of Southold and Shelter Island, together with CSF (collectively, "Southold Plaintiffs"), initiated action 04 Civ. 3860 (the "Southold case") in this Court against the Town claiming an undue burden upon interstate commerce as a result of the Town's prohibitions on high speed and vehicle ferries (the "Fast Ferry Ban" and "Vehicle Ferry Ban," respectively) in the Ferry Law. The Southold Plaintiffs contended that the Fast Ferry and Vehicle Ferry Bans, were, *inter alia*, a *per se* violation of the dormant Commerce Clause, or alternatively, imposed an undue burden on interstate commerce under the Pike balancing test. See Pike v. Bruce Church, Inc, 397 U.S. 137, 90 S. Ct. 844, 25 L. Ed.2d 174 (1970). All parties moved for summary judgment. By Opinion and Order dated December 21, 2005, this Court granted the Town's motion, and dismissed the case. See Town of Southold v. Town of E. Hampton, 406 F. Supp. 2d 227 (E.D.N.Y. 2005). CSF appealed to the Second Circuit; Southold

and Shelter Island did not. On February 8, 2007, the Second Circuit remanded the case to the District Court finding that "[o]n the burden side of the Pike balancing equation, genuine issues of material fact exist with respect to the degree of the burden on interstate commerce. Genuine issues of material fact also exist on the benefits side of the Pike equation." Town of Southold v. Town of E. Hampton, 477 F.3d 38, 51-52 (2d Cir. 2007) (citations omitted).

Plaintiff initiated the present action (05 Civ. 1792) in this Court against the Town in April 2005, claiming, as the Southold Plaintiffs had, that, *inter alia*, the Fast Ferry and Vehicle Ferry Bans violated the dormant Commerce Clause. All parties moved for summary judgment. This Court granted the Town's motion for summary judgment and dismissed the case. See Francarl, 2006 WL 4449577, at *10. Plaintiff appealed to the Second Circuit. The Second Circuit remanded the instant case for "further proceedings" on Plaintiff's dormant Commerce Clause claim pursuant to Pike, stating "[t]he issues raised by plaintiffs' appeal are directly governed by Town of Southold." Francarl Realty Corp. v. Town of E. Hampton, 239 F. App'x 695, 695 (2d Cir. 2007). The Second Circuit stated, *inter alia*, that

> [w]e considered an almost-identical [sic] challenge to the Ferry Law in Town of Southold v. Town of East Hampton, 477 F.3d 38 (2d Cir. 2007) . . . . [T]he Ferry Law does not facially discriminate against interstate commerce . . . Nor is there evidence showing that the Ferry Law was enacted for the purpose of discriminating against out-of-state interests." Id. at 48.

Francarl, 239 F. App'x at 695.

On September 21, 2007, Plaintiff petitioned for rehearing of the appeal, claiming, *inter alia*, that the Second Circuit's determination that the Plaintiff's challenges were "almost identical" to the challenges raised in the Southhold case, demonstrated a "profound misapprehension" of the issues, and that Plaintiff's arguments had been given "short shrift."

(Pet. for Reh'g, dated Sept. 21, 2007, p. 2.) On October 15, 2007, the Second Circuit denied Plaintiff's petition.

Discovery was subsequently consolidated in this case and the Southold case. On or about September 8, 2008, CSF and the Town entered into a stipulation discontinuing the Southold case, which was dismissed in its entirety.

On July 2, 2008, Plaintiff moved for partial summary judgment in the instant action alleging, *inter alia*, that the Fast Ferry Ban is unconstitutional because it fails the Pike balancing test. This Court held a bench trial from February 2, 2009 through February 4, 2009 to determine whether the Fast Ferry and Vehicle Ferry Bans pass the Pike balancing test in accordance with the Second Circuit's Mandate. See Francarl, 239 F. App'x at 696-97.

III.    The Trial

The parties stipulated that traffic and vehicular congestion are continuing Town concerns. (Tr. 454-55.)

Plaintiff's direct case consisted only of the testimony of its principal, Paul G. Forsberg Sr., and the Town's witnesses. It was agreed that, for the sake of expediency, Plaintiff would call Town witnesses during the Plaintiff's direct case and Defendant would inquire thereafter.

A.    Paul G. Forsberg, Sr.

Mr. Forsberg, whose father began the business in 1951, now operates the Francarl

10

franchise from the Montauk ferry terminal. (Tr. 57.) The business, which also employs other Forsberg family members, offers commercial and party fishing excursions as well as ferry services to ports outside New York State. (Tr. 59.)

According to Mr. Forsberg, the Ferry Law prevents him from establishing a ferry service from Montauk to Block Island and from Block Island to New Bedford, Massachusetts. (Tr. 60.) Although Plaintiff's corporate offices are in Montauk, he contends that the Ferry Law impedes his interstate operation because it denies him the opportunity to operate "fast" and vehicle ferries to points outside the State of New York. He attempted to establish these routes in 2007 but an unspecified number of passengers became nauseated, which he believes was occasioned by the length of the trip. Nevertheless, and despite this testimony, it appears that Plaintiff not only presently operates to Block Island and New London, Connecticut, but that it advertizes the service as "by high speed ferry featuring an anti-seasickness design," (www.vikingfleet.com).[6]

Mr. Forsberg considers himself to be knowledgeable regarding vessel stabilization systems. His "knowledge" was gleaned from annual meetings of unspecified "organizations," (Tr. 69), discussions with marine architects who explained "how the stabilization systems work," (Tr. 70), and his personal observations of passengers he has seen on fast ferries. Mr. Forsberg conceded that a vessel stabilization system would alleviate some of the seasickness but, in his opinion, it would also make a vessel slower. According to Mr. Forsberg, "[t]he theory is, the faster you go, the less time they have to get seasick. And the faster the boat is, the better they

---

[6] In addition, a 1990 memorandum to the Chair of the Town Planning Board from a Town Planner indicated that Plaintiff was then operating ferries to "Mystic, Newport, Martha's Vineyard, New London and Block Island." (See Mem. from Marguerite Wolffsohn, Planner, to Debra Foster, Planning Board Chairman, dated July 2, 1990, attached as Ex. 12 to Documents Requested by the Court.)

stabilize." (Tr. 72.)

Mr. Forsberg concluded that if the Ferry Law was annulled, his ridership would increase; an increase in ridership would add new runs to the existing schedule; new runs would increase profits, therefore, annulment of the Ferry Law would make his business more profitable. (Tr. 74-76.) However, since he had conducted no market studies to determine whether the annulment of the Ferry Law would, in fact, increase customer demand, there was no evidence to support the major premise of his syllogism. (Tr. 153-54.)

Mr. Forsberg would like to operate twelve (12) months a year, with ferries carrying one hundred and forty-nine (149) passengers[7] and approximately thirty-five (35) vehicles per trip, (Tr. 115), up to one thousand three hundred forty-two (1342) passengers per day. (Tr. 259.) In reality, he has never carried more than one-half (½) of that number of passengers in any single day. (Tr. 208.) He acknowledged that the Town traffic would be increased, at the least, by whatever number of vehicles were coming to the Montauk terminal to use the proposed vehicle ferry, (Tr. 168), and envisions one hundred and forty (140) cars arriving at the terminal at the beginning and end of each day from vehicle ferry service. (Tr. 157.)

According to Mr. Forsberg, fast ferries are more economical because "they get up on top of the water," requiring less horsepower. (Tr. 131.) Less fuel and less horsepower increases engine life which would permit Mr. Forsberg to charge lower passage fees. (Tr. 133.) However, this testimony was unsupported and somewhat questionable because he also testified that in

---

[7] This testimony was contrary to an affidavit submitted by Mr. Forsberg in conjunction with his motion for partial summary judgment which stated: "Viking's Fast Ferries would have a capacity of approximately 100 persons." (Aff. of Paul G. Forsberg Sr., dated April 4, 2006 ("Forsberg Aff."), ¶ 14.)

1985, more than a decade before adoption of the Ferry Law, he *sua sponte* reduced the

horsepower on the Viking Starship, which was capable of traveling at twenty-three (23) knots,

from two thousand four hundred and fifty (2,450) horsepower to one thousand four hundred

(1400) horsepower, thereby reducing its potential speed to 13 ½ knots for unspecified "reasons of

economics." (Tr. 159.) He also sold the Viking Quest, which was capable of achieving twenty

(20) knots and more than two thousand (2, 000) horsepower prior to the passage of the Ferry Law

because it had an "insufficient capacity" of one hundred and forty-nine (149) passengers. (Tr.

162.) This testimony was also unconvincing because Mr. Forsberg also testified that he had *sua*

*sponte* reduced the passenger load on his larger ferries to avoid Coast Guard "paperwork." (Tr.

285.) Had he not sold the Quest, he would lose only five (5) minutes in traveling to Block

Island. (Tr. 174.) He claims that the Ferry Law adds thirty-five (35) to forty (40) minutes to the

trip using the "slow" ferries. (Tr. 174.) However, Mr. Forsberg admitted that he presently

advertizes "fast" ferry service.[8]   (Tr. 161-62.)

Mr. Forsberg acknowledged that additional runs would increase the traffic in Montauk

and upon the roads which lead to Montauk. (Tr. 157, 175.) He could not, however, state the

number of additional vehicles that increased Montauk ferry service would place on the Town's

roads as he knew of no studies examining the issue. (Tr. 157-58, 169.) At his deposition

(Forsberg Dep. 56: 4-10), he had noted the difficulty of traversing Route 27, particularly in the

---

[8] Plaintiff's 2008 website indicates that Plaintiff operates daily seasonal "hi-speed" ferry service to Block Island and on weekends to New London which take one (1) hour. (www.vikingfleet.com.) In an affidavit submitted on Plaintiff's motion for summary judgment, Mr. Forsberg stated, "using Viking's existing slow ferries, a trip [to New London] takes approximately 2 hours. Utilizing a fast ferry, the same trip would be reduced to approximately 55 minutes." (Forsberg Aff. ¶11)

summer months, due to heavy traffic, (Tr. 205), which causes drivers, including Mr. Forsberg, to use back roads to avoid the traffic in the Bridgehampton area. (Tr. 205.)

In Mr. Forsberg's opinion, the annulment of the Ferry Law would also increase his existing business from Montauk to Block Island and enhance tourism for Block Island businesses. (Tr. 77.) The basis for this testimony was unclear as he conceded that he had not conducted any market research to study interest in a fast or vehicle ferry route from Montauk to Block Island or New Bedford and he did not produce any objective evidence to substantiate these claims. (Tr. 151-53.)

Mr. Forsberg indicated that his ferry service is presently a minor means of transport to the Town, (Tr. 300), compared to other modes of travel.

Contrary to his trial testimony, in 1997, at a public hearing prior to adoption of the Ferry Law, Mr. Forsberg advocated against an expansion of Montauk ferry service, and high speed ferries in particular, (Tr. 206, 268-70), noting their negative impact upon traffic congestion and environmental issues in the Town. (Tr. 193, 207.) He also acknowledged that his attorney, Mr. Greenbaum, spoke for him at the 1997 hearing, when he said:

> Then everybody is going to waste the resources on [whether Mr. Forsberg's business constituted a preexisting use under the Town Code] and we'll never have time to sit down and intelligently reasonably [sic] to work out something that involves everybody's common interest of keeping Cross Island [sic] out and keeping the high speed ferries out.

(Tr. 205; Ferry Public Hr'g, Tr. of Tape 2, p. 98.) Although Mr. Forsberg claimed at trial that his concerns in 1997 were for local families, not local businesses, this claim was belied by his more recent deposition testimony, (Forsberg Dep. 197:22-198:21), that the Ferry Law harms local businesses in East Hampton because "[i]t stops people from coming to Montauk from other

14

states . . . [s]uch as Connecticut or Block Island." (Tr. 272.) Indeed, and also contrary to his position at trial that the Ferry Law benefits local interests at the expense of interstate business, Mr. Forsberg contended that in 1997 he spoke against passage of the Ferry Law based upon his perception that it would "be hurting the local people that live here. Not the tourists, you're going to be hurting the local people first[,] . . . anybody that caters to tourism . . . would . . . have less business." (Tr. 269, 272.)

A faster ferry would also shorten the return trip of his employees, who bring his boats to Rhode Island for repair, by approximately one and one half (1 ½ ) hours and save the business unspecified amounts in gasoline and wages. (Tr. 129, 143.) According to Mr. Forsberg, the employees bring the vessel to a Rhode Island facility, carrying a vehicle on board which could, but for the Ferry Law, board a Forsberg vehicle ferry for the return trip. (Tr. 147-48.) The frequency of these trips and the anticipated savings were not stated.

In Mr. Forsberg's opinion, the Ferry Law promotes local business, (i.e. the North South ferries) to the detriment of interstate commerce (i.e. his business) by requiring the local population to drive to Shelter Island in order to secure vehicle ferry transportation. (Tr. 122.) However, and although he contends that the Ferry Law benefits the local interests of the North and South ferry services, many of the riders on those intrastate routes were actually bound for Orient Point to engage in interstate travel, or returning to New York from interstate trips, thus benefitting interstate travel as well as intrastate travel. (Tr. 170.) He also claimed, without evidence, that an unspecified number of residents of the Town, who presently travel to Shelter Island to get to Orient Point, would use his service instead if he could provide vehicle ferry service.

And, although Mr. Forsberg contended that the Ferry Law precluded or impeded interstate travel from Long Island to Block Island or New Bedford, he conceded that other extant ferry services could provide these services from Orient Point. (Tr. 153.) As with his claims regarding the detriment to business at Block Island and Martha's Vineyard, the basis of his opinions was anecdotal hearsay, (Tr. 261), and the fact that the sole modes of travel to Block Island are private boat, plane and "slow" ferry. (Tr. 298.) But see *supra* note 8. Moreover, his deposition testimony indicated that he believed the Ferry Law discouraged tourists from traveling to East Hampton as well as Block Island, contradicting his claim that Town businesses benefitted at the expense of Block Island's tourism trade. (Tr. 272.)

Insofar as Mr. Forsberg indicated at trial that the Ferry Law had decreased his ridership, he acknowledged that he had *sua sponte* decreased the number of passengers on his ferries, not because of the Ferry Law, but in order to avoid Coast Guard regulations which were instituted at the behest of the United States Department of Homeland Security. (Tr. 285.) Mr. Forsberg found the Coast Guard regulations, requiring "about three inspections a year . . . , [t]raining, books, all kind of regulations[,] . . . became such a nuisance," (Tr. 286), and, since the regulations were applicable to vessels carrying more than one hundred and forty-nine (149) passengers, he chose to carry no more than one hundred and forty-nine (149) passengers on any Viking ferry. A document generated by Plaintiff's staff indicates a decrease in Viking's business to Block Island from 1998 to 2000, which then remained constant from 2000 to 2002, decreased between 2002 and 2005, and then increased between 2005 and 2007. (Tr. 278-81; Montauk to Block Island Schedules, attached as Ex. D to Forsberg Dep.) Mr. Forsberg testified that his ridership had decreased in 2008 due to the economy. (Tr. 280-82.)

16

According to Mr. Forsberg none of the other ports he enters have a limitation upon ferry horsepower or maximum speed. (Tr. 123.)

Despite Mr. Forsberg's testimony that the Ferry Law limits his business, he presently operates weekend ferry service from Montauk to New London, and one (1) or two (2) trips per year to Martha's Vineyard, via his Superstar ferry, which travels at nineteen and four tenths (19.4) knots and develops one thousand nine hundred and twelve (1,912) horsepower. He has been operating this interstate service for three (3) years. (Tr. 140.) Mr. Forsberg testified that he operates to Block Island between Memorial Day and Columbus Day, depending upon the weather, running two (2) trips a day on the weekend and one (1) during the week. (Tr. 302.) Mr. Forsberg conceded that he had operated to Martha's Vineyard and New London, as well as to Block Island prior to the adoption of the Ferry Law and that the service was not only feasible, but profitable. (Tr. 142.) He testified that the trips from Montauk to Block Island and New London were about the same distance and took an hour (1) and twenty (20) minutes by "slow ferry" and forty (40) minutes by "fast" ferry. However, Plaintiff's website advertizes an estimated travel time of one (1) hour to both ports by "hi-speed" ferry. (www.vikingfleet.com.)

Insofar as Mr. Forsberg testified that there could be no ferry service between Manhattan and Montauk, (Tr. 179-81), due to the many small boats in the Long Island Sound, he conceded that he had, in deposition testimony, indicated that other ferry operators had actually discussed a Manhattan to Montauk ferry service after the imposition of the Ferry Law.[9] (Tr. 173.)

In sum, Mr. Forsberg's testimony was inconsistent and unsubstantiated and contrary to,

---

[9] It appears that Ferry Service to Manhattan was not only envisioned, but implemented from Glen Cove, New York through the Long Island Sound. (See www.fastferry.info.org.)

*inter alia*, his own prior testimony, affidavits and website.

B.     Lisa Liquori

Ms. Liquori presently operates a planning consultation firm, which she started in 2001. (Tr. 316.) She holds a Bachelor of Arts degree with a specialty in environmental studies and a Masters degree of Regional Planning. She began her planning career in 1981 as a planner for the Town. She reviewed all applications for site plans, subdivisions, special permits and variances and advised the Town's planning boards, Zoning Board of Appeal and the Town Board. (Tr. 316.) She presently consults with the Town and other clients on planning issues. (Tr. 316.)

Ms. Liquori testified that periodic comprehensive plan updates are required by New York State Law and that any land use regulation should be premised upon a comprehensive plan. Thus, in 2004, she was retained by the Town to evaluate and update the Town's comprehensive plan of 1984 and all subsequent Town plans, including the 1997 Transportation Element, to aid the Town Board in assessing which plans should be retained and which would be discarded. (Tr. 446.) Following review with Ms. Liquori, the Town Board determined to retain the Transportation Element. (Tr. 446.)

Ms. Liquori prepared the request for proposals to aid the Town in the selection of a consultant to work on the update to the Transportation Element, reviewed the proposals that were submitted, and worked on developing the scope and outline of the project. She also served on a technical advisory committee. (Tr. 339.)

Ms Liquori testified that certain methods of alleviating travel congestion in the Town

18

were not considered by the Town, (Tr. 340), in order to preserve the character of the area or because "there would be not necessarily consensus as to whether they would mitigate traffic or not," (Tr. 400), or whether "some of those measures could actually help increase or exacerbate traffic." (Tr. 401.) These included through-lanes, bypass roads and installation of traffic signals. (Tr. 341.)

According to Ms. Liquori public opinion is "a very important foundation for planning" because "[i]t is not the planner's opinion as to what a community should be, it is the community's opinion as to what it should be, that the planner helps come up with various solutions and various alternatives to meet." (Tr. 510-11.) She also stated that "public input is a major component of preparing a comprehensive plan" because "[a ] plan is not done in isolation or distinct from the public. Part of the way a plan is prepared is to gather public information, public input, and incorporate that as part of the plan, as part of the decision. It is a plan for the people as much as anything else." (Tr. 447.)

Ms. Liquori testified that " the primary access to East Hampton, not only from Long Island but from the rest of New York state and the rest of country, is through this one roadway, New York State 27, a two-lane undivided highway," which provides one (1) lane in each direction between the Town border on the western side of East Hampton and Montauk. (Tr. 468.) Over the last two (2) decades the traffic on Route 27 has worsened, at times to the level of "failure conditions" because "road capacity many times exceeds, is worse than, C. It goes down to D, E. Sometimes even F levels." (Tr. 476.) At times "traffic has come to an absolute stop. People have been prohibited from leaving Montauk and did not get any farther west because of an accident on Montauk Highway." (Tr. 479-80.) The traffic congestion continues into Montauk because "[t]here

are fewer and fewer roads by the time you get to Montauk." (Tr. 479.) Indeed, she noted that "[b]y the time you do get to Montauk, there is only one road connecting Montauk to the rest of the world. And that's when you go through the narrowest part of the Town, the place where it is less than one (1) mile wide, approximately one-third (1/3) mile wide . . . So you have to be very careful that you are not overburdening that road system and creating a huge potential that you can't move back west when you might need to." (Tr. 499.) This could, in addition to increasing traffic congestion, imperil access to emergency services including hospitals and food supplies. (Tr. 501.) Ms. Liquori noted that the "traffic problem has been worsening . . . as time goes on as the Town continues to get more developed" and that, beyond the increase in the year-round or seasonal population, "the traffic of East Hampton is increasing at a rate higher than the rate of growth." (Tr. 480.) Ms. Liquori noted that while traffic entering the Town is a major problem, traffic on local roadways is also problematical. (Tr. 343.)

Based upon origin-destination studies, vehicle and "fast" ferries could not have the effect of reducing vehicular traffic entering the Town from the West, since approximately ninety-two percent (92%) of those travelers were coming from Nassau and Suffolk counties, the five (5) boroughs and New Jersey, i.e. travelers who would not be going to Connecticut to take a ferry to Montauk (Tr. 517-18.) Thus, there was concern that vehicle and high speed ferries would not only not "provide a service for the existing or an alternative to the existing origins of where people were coming from, but it would be perhaps drawing and generat[ing] new traffic." (Tr. 518.) The remaining eight percent (8%), presumably now entering the Town from New England, might opt for faster or vehicle service.

Ms. Liquori agreed with the Transportation Element's findings that at the peak of the

20

season travel to the Town is primarily by automobile, bus and rail, (Tr. 345), that the majority of automobile traffic travels into the Town via Routes 27 and 114 traveling west to east, (Tr. 345-46), and that traffic peaks in August, (Tr. 352). She also indicated that, although the population increases in the summer tourist season, (Tr. 345), at present she cannot define "off season" or "peak season" because they are "extended now, and they have got shoulders . . . because they are starting to . . . bleed into shoulder seasons," (Tr. 344).

She agreed with Plaintiff's counsel that the daily traffic in Montauk is approximately one-third (1/3) of the traffic in Wainscott, further west, (Tr. 357-59), and that one of the reasons that the update to the Transportation Element was undertaken was in response to a proposal by the Cross Sound Ferry to establish a new ferry service between Montauk and Connecticut, (Tr. 360-61).

According to Ms. Liquori, there are many provisions of the Town Code regarding ferry service which are designed to handle traffic in the Town. (Tr. 366.)

In Ms. Liquori's opinion, as long as the existing Francarl franchise did not change its operation "one iota" it could continue as a preexisting use. (Tr. 367, 370-72.) In her deposition testimony, she stated that, it was not within the scope of the Planning Director's responsibilities to make such a determination. Rather, "[i]t is something the building inspector makes, in consultation with the town attorney." (Tr. 440.) Therefore, subject to many caveats, including discussion with the Town's attorneys and building inspector, and taking into account "all of the existing rules and codes of the state and town that apply must be adhered to regardless of the capacity of the boats and the number of boats that a particular ferry operation could use . . . it does not appear . . . that changing the number of boats . . . would be a prohibited action." (Tr. 440.)

21

Nevertheless, if a ferry operation preexisted the Ferry Law, she believed that it would not require a special permit if it continued "as it had before." (Tr. 324.) However, a change in parking or use of a different boat or other change in dock configuration might trigger multiple additional reviews. (Tr. 369-70.) As an example, Ms. Liquori indicated that changing a vessel from one with a three hundred (300) passenger capacity to one with a six hundred (600) passenger capacity, despite carrying the same daily "overall passenger number, that larger boat might then require other town reviews because in order to dock it up, you are going to need other things." (Tr. 375.) Ms. Liquori stated that the purpose of the FPC was only to establish a threshold number for determining when there had been a "substantial expansion" under the Town Code, which would require a new special permit. (Tr. 383.)

Ms. Liquori testified that, contrary to Plaintiff's contention, the FPC does not indicate the Town's approval of the amount of traffic generated by ferry patrons because the number of people patronizing the Francarl terminal does not take into account "other people coming to wait and see and have coffee and say, you know, *bon voyage* to the people that are there." (Tr. 385-86.)

According to Ms. Liquori, while the installation of turn lanes might be a mitigation measure noted in the ferry portion of the Transportation Element, since "these lanes already exist and the principal reason for excessive delays is the near continuous flow of traffic on the main road, installation of turning lanes may not be sufficient to mitigate the deterioration in level of service caused by the traffic increases." (Tr. 398-99; see also Transportation Element p. 6-17.)

Although a bypass to Sunrise Highway had also been considered, it could not be implemented by the Town because it was not a Town road. (Tr. 424-25.) While bypass studies and proposals had been considered by state and county officials, and a 1986 report recommended

bypass construction as one of nine (9) viable alternatives for the area, ultimately the state decided against the bypass alternative, a position which the state maintains to date. (Tr. 528.) And, since it is a state road, even assuming that the Town had available land to build a bypass, it would require a right of way from the state. She also indicated that Cape Cod, Massachusetts, a community similar to the Town, had implemented bypass roads without apparent success in stemming the flow of traffic. Indeed, creating the additional roadways only increased the influx of travel to and through that community. (Tr. 505-06.) In any event, at this time the construction of bypasses are "a physical impossibility" in the congested areas due to the Town's extensive development, wetlands, "sensitive" and historic areas. (Tr. 533-34, 539.) Thus, the East End planners and the East End Transportation Council did not consider additional roadways as a solution.

According to Ms. Liquori "the history of Long Island can almost be characterized that as soon as you build more roads going further east, development accompanies it to the point where the roads got congested almost as soon as they were opened, past the point of their capacity." (Tr. 508.) In addition, increasing roadways could negatively affect the environment and local economy. (Tr. 508-09.)

The Transportation Element indicated that "through" lanes would not be proposed as a means of ameliorating the traffic in the Town, but considered shuttle bus service and car pooling (Transportation Element pp. 4-5, 6-13) to connect to ferry service. (Tr. 415-16.) It also considered "intermodal connection" to Montauk Harbor and limiting the number, size and frequency of arrivals and departures of ferries to off-peak hours as a means of reducing traffic congestion. (Tr. 416-17.) The Transportation Element also examined "traffic mitigation measures that would not adversely affect the rural character" of the area and analyzed measures taken by other similar resort

23

communities. (Tr. 419.) Pursuant to the Transportation Element, the social and economic utility of ferry service would be weighed against any unmitigated environmental impact on a case by case basis. (Tr. 419.)

Ms. Liquori indicated that the Transportation Element assumed a vehicle generation rate of one vehicle per three (3) ferry passengers.

In her testimony Ms. Liquori indicated her familiarity with certain documents and studies and reports upon which she relied in advising the Town, (Tr. 484-85), including: (1) South Fork Transportation Local Task Force, Sunrise Highway Extension Report, (Ex. 1); (2) South Fork Origin and Destination Survey, Statistical Data Report, (Ex. 2); (3) Route 27 South Fork Shinnecock Canal to Montauk Point, (Ex. 3); (4) Transportation Project Report, South Fork Transportation Study, (Ex. 4); (5) Best Practices in Arterial Management, (Ex. 80); (6) Action Strategy for 1997, Recommendations Proposed By the East End Transportation Council of the East End Supervisors and Mayors Association, (Ex. 81); and (7) Traffic Count Data Report, (Ex. 82). (Tr. 484-85.) She also testified to meeting with officials from the Town of Southhold in 1995 to discuss the sudden expansion of the ferry service in that Town and the resulting traffic problems including congestion as a consequence of Southhold's lack of regulations. (Tr. 491-92.) Indeed, the Southhold supervisor wrote to the East Hampton supervisor to advise of its opposition to the Town of East Hampton's proposed Ferry Law.[10] (Ex. 37.)

---

[10] Although the stated basis for the Town of Southold's opposition to the Ferry Law is the disenfranchisement of South Fork residents from fast and vehicle ferry services, that altruistic position is belied by the fact that the Town of Southold subsequently commenced a lawsuit against East Hampton, Town of Southhold v. Town of E. Hampton, 04 Civ. 3860, in which the Town of Southold complains of increased traffic that "places a burden on the economic resources of [the Town of Southold], which are required to provide additional municipal services, including police and emergency services, highway maintenance and repair, and traffic control.")

Ms. Liquori's testimony was consistent with, and substantiated by, undisputed independent documentary evidence, as well as her prior testimony.

C.    Raymond DiBiase

Mr. DiBiase was the principal author of the Town's Transportation Element in 1997. (Tr. 542.) He holds a Bachelor's degree of Civil Engineering and professional engineering licenses in New York and New Jersey. He has been in the traffic and transportation field since 1975 and was certified as a professional traffic operations engineer in 1999. (Tr. 557.)

The Transportation Element focused primarily on the months from May through October, and August in particular, because that was the peak traffic period, (Tr. 544), and because examination of "peak design hour" is typical of intersection study. (Tr. 561.) Peak design hour is a term of art for the thirtieth highest hour of the year in terms of traffic volume. (Tr. 561.) The Transportation Element made no specific recommendations for the off peak months.

The Transportation Element established three (3) scenarios for new ferry service from Montauk to Connecticut, estimated the traffic generation from each scenario, applied the estimated traffic generation to already existing traffic at certain intersections and analyzed the impact at those intersections. (Tr. 546.) He did not consider the existing Francarl operation, the impact of its schedules and passenger capacity other than those hypothesized in the Transportation Element, or intersections at some distance from Lake Montauk and the Francarl terminal. (Tr. 546-48.) He assumed that passengers would be transported by two (2) buses as well as private automobiles.

_____

(Compl. ¶ 31, 04 Civ. 3860; see also Tr. 495.)

25

(Tr. 558.)

Mr. DiBiase considered the origin-destination study the most reliable and reasonable method of identifying Town drivers. (Tr. 548-49.)

He agreed with Plaintiff's counsel that a factor in the area's traffic congestion problem was the fact that Route 27 functions as a through road and carries local traffic to local destinations. (Tr. 549.)

The Transportation Element did not study the possibility of constructing bypass roads because the public was opposed to additional roadway construction. (Tr. 550.)

Mr. DiBiase assumed a traffic generation rate of one (1) vehicle for every three (3) passengers and that figure would not be altered by a decrease in passengers. (Tr. 551.) He derived the ratio from the Cross Sound ferry operation. (Tr. 559.)

In determining intersection impact, Mr. DiBiase allocated percentages of vehicles to different intersections because not all ferry passengers would take identical routes to a terminal. (Tr. 552.) He then determined the impact upon the level of service. (Tr. 553.) "Level of Service" refers to "a nationally accepted means of determining roadway capacity" as defined by the Highway Capacity Manual. (Tr. 560.) Levels of service were most negatively affected on side streets entering Route 27. (Tr. 553.)

Based upon Scenario A in the Transportation Element, which considered a passenger ferry transporting three hundred and fifty (350) passengers, there would be a one (1) level decrease in the level of service in the morning at two (2) locations and at three (3) locations in the evening hours. The decreased levels of service, from a "B" level to a "C" in the morning at two (2) locations and in the evening at one (1) location, and from an "E" to an "F" at two (2) locations in

26

the evening was "significant," indicating "available capacity at the intersection is being used up." (Tr. 562.) The speed of a ferry would not have any effect upon the Transportation Element's analysis. (Tr. 554-55.) According to Mr. DiBiase each departure and arrival of a ferry at capacity of three hundred and fifty (350) passengers would generate one hundred and seventeen (117) vehicles and multiple trips would multiply the same effect more often during any given day. (Tr. 566-67.) Also affecting the service level at intersections is the "critical movement" of vehicles which seek to enter the main road from side roads and are hampered by the steady stream of main road traffic. (Tr. 568-69.)

The Transportation Element advised that additional ferry service would increase the deterioration of the Town's levels of service. (Tr. 591-92.)

The Transportation Element was re-adopted in 2005. (Tr. 572.)

Mr. DiBiase's testimony was entirely credible.

IV.    Discussion

A.    Legal Standard

The Commerce Clause of the United States Constitution grants Congress the authority to "regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8, cl. 3. The Supreme Court has long held that the clause contains both an affirmative grant of power and "a further, negative command, known as the dormant Commerce Clause . . . [that] prevents a State from . . . plac[ing] burdens on the flow of commerce across its borders that commerce wholly within those

borders would not bear." American Trucking Ass'ns v. Mich. PSC, 545 U.S. 429, 433, 125 S. Ct. 2419, 2423, 162 L. Ed. 2d 407 (2005) (citations and quotation marks omitted).

"In analyzing a challenged local law under the dormant Commerce Clause," a court "first determine[s] whether it clearly discriminates against interstate commerce in favor of intrastate commerce, or whether it regulates evenhandedly with only incidental effects on interstate commerce." Town of Southold, 477 F.3d at 47 (citing Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 217-18 (2d Cir. 2004)). "Discrimination" refers to the "'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" Town of Southold, 477 F.3d at 47 (quoting Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality, 511 U.S. 93, 99, 114 S. Ct. 1345, 128 L. Ed.2d 13 (1994)).

"A law that only incidentally burdens interstate commerce is subject to the more permissive balancing test under [Pike, 397 U.S. at 142], and will be struck down if the burden imposed on interstate commerce clearly exceeds the putative local gains." Town of Southold, 477 F.3d at 47. A "party challenging a law as either clearly discriminatory or violative of Pike bears the threshold burden of demonstrating that it has a disparate impact on interstate commerce," and "'[t]he fact that it may otherwise affect commerce is not sufficient.'" Id. (quoting Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc., 155 F.3d 59, 75 (2d Cir. 1998)).

If the plaintiff meets its threshold burden, "the burden shifts to the government to show that the local benefits of the law outweigh its discriminatory effects and that the government lacked a nondiscriminatory alternative by which it could protect the local interests." Town of Southold, 477 F.3d at 47 (citing USA Recycling, Inc. v. Town of Babylon, 66 F.3d 1272, 1281-82 (1995)). If the plaintiff "cannot show discrimination, however, it must demonstrate that the law places a burden

on interstate commerce that is clearly excessive in relation to the putative local benefits." Town of Southold, 477 F.3d at 47 (citations and internal quotations marks omitted).

Since the Second Circuit "determined that 'the Ferry Law does not facially discriminate against interstate commerce . . . Nor is there evidence showing that the Ferry Law was enacted for the purpose of discriminating against out-of-state interests,'" Francarl, 239 F. App'x at 696 (citing Town of Southold, 477 F.3d at 48), the Court considers the validity of the Fast Ferry and Vehicle Ferry Bans under the Pike balancing test. See Francarl, 239 F. App'x at 696.

Pursuant to Pike,

> [w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

397 U.S. at 142; see also Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 169 (2d Cir. 2005) ("To apply this balancing test, we consider (1) the nature of the local benefits advanced by the statute; (2) the burden placed on interstate commerce by the statute; and (3) whether the burden is 'clearly excessive' when weighed against these local benefits.") (quoting Pike, 397 U.S. at 142). "[I]ncidental burdens to which Pike refers are the burdens on interstate commerce that exceed the burdens on intrastate commerce," therefore, "at a minimum, the challenged regulation must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce." Town of Southold, 477 F.3d at 50 (citations and quotation marks omitted).

V.    Findings of Fact and Conclusions of Law

A.    The Burden of Proof

Plaintiff compares its ferry service to "conduits or instruments of interstate commerce," i.e. common carriers, railroads and pipelines, (Pl.'s Post Trial Mem. of Law ("Pl.'s Post Trial Mem."), p. 18), and contends that "[i]n those cases, the courts do not require disparate impact, and proceed to directly balance the putative local benefits of the law against the burdens on interstate commerce, as applied to the plaintiff." (Id.) Plaintiff cites four (4) cases for the proposition that Defendant bears the initial burden of proof: (1) Southern Pac. Transp. Co. v. St. Charles Parish Police Jury, 569 F. Supp. 1174 (E.D. La. 1983); (2) New York State Natural Gas Corp. v. Town of Elma, 182 F. Supp. 1 (W.D.N.Y. 1960); (3) Transcontinental Gas Pipeline v. Borough of Milltown, 93 F. Supp. 287 (D. N.J. 1950); and (4) Southern Pac. Co. v. Arizona, 325 U.S. 761, 65 S. Ct. 1515, 89 L. Ed. 1915 (1945). Three (3) of these cases predate Pike and none are instructive as they do not stand for the proposition propounded by Plaintiff.

In Southern Pac. Transp., the plaintiff provided substantial evidence that the contested statute, which limited rail speed traveling through a Louisiana Parish on a route from New Orleans, Louisiana to Houston, Texas, would increase the number of accidents at rail crossings. Moreover, the Railroad Passenger Service Act established a goal of systemwide average rail speeds of fifty-five (55) miles per hour and the purpose of the Federal Railroad Safety Act was to establish uniform rail laws, thus recognizing a national interest in such uniformity in laws relating to interstate rail service safety.

In New York State Natural Gas Corp., the plaintiff had been denied permission to build the

part of a thirty (30) mile interstate gas distribution system going through the defendant Town. As in Southern Pac. Transp., the defendant presented no basis for the denial of the permit, which the court held was beyond the police power of the state and part of a federally authorized pipe line connect.

In Transcontinental, the plaintiff successfully enjoined local interference with its Federal Power Commission Certificate to construct one thousand eight hundred (1800) miles of interstate gas pipe line.

And, in Southern Pacific Co., the Court found that the challenged law, which limited rail car lengths, would, based upon the evidence presented by the plaintiff, increase accidents and decrease efficiency with "at most slight and dubious [safety] advantage, if any, over unregulated train lengths." 325 U.S. at 779.

In all of these cases, the challenged statutes sought to prevent a federally sanctioned purpose, on an interstate infrastructure going through the defendant's jurisdiction, and the plaintiffs presented substantial documented/expert evidence. None of these factors is present in the instant litigation.

Moreover, Plaintiff's proposition is belied by case law from the United States Supreme Court and the Second Circuit Court of Appeals, see, e.g., Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429, 444, 98 S. Ct. 787, 795, 54 L. Ed. 2d 664 (1978) (stating that "those who would challenge state regulations said to promote highway safety must overcome a strong presumption of [their] validity") (citations and internal quotation marks omitted); USA Recycling, Inc. v. Town of Babylon, 66 F.3d 1272,1281-82 (2d Cir. 1995); National Tank Truck Carriers, Inc. v. City of N.Y., 677 F2d 270, 273 (2d Cir. 1982), which postdate the Pike decision.

As noted above: "The party challenging a law as either clearly discriminatory or violative of Pike bears the threshold burden of demonstrating that it has a disparate impact on interstate commerce - '[t]he fact that it may otherwise affect commerce is not sufficient.'" Town of Southold, 477 F.3d at 47 (quoting Automated Salvage Trans., 155 F.3d at 75). Further, "the incidental burdens to which Pike refers are the burdens on interstate commerce that exceed the burdens on intrastate commerce," therefore, "at a minimum, the challenged regulation must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce." Town of Southold, 477 F.3d at 50 (citations and quotation marks omitted).

Based upon the foregoing, Plaintiff has the burden of proving incidental burden(s) upon interstate commerce occasioned by the Ferry Law which outweigh the intrastate burdens and local benefits of the Ferry Law. See id. at 50.

B.      Incidental Burden on Interstate Commerce

Plaintiff contends that the Ferry Law creates four (4) classes of incidental burden upon interstate commerce.

The Second Circuit has

recognized three circumstances in which an evenhanded regulation imposes an incidental burden on interstate commerce: (1) when the regulation has a disparate impact on any non-local commercial entity; (2) when the statute regulates commercial activity that takes place wholly beyond the state's borders; and (3) when the challenged statute imposes a regulatory requirement inconsistent with those of other states.

Id. (citations and quotation marks omitted).

Plaintiff claims that the Ferry Law imposes all three (3) of the circumstances enumerated by the Second Circuit and, noting that the set of circumstances listed by the Second Circuit is not exclusive, (see Pl.'s Post Tr. Mem, p. 18 (citing United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt Auth., 438 F.3d 150, 156-57 (2d Cir. 2006); National Elec. Mfrs. Ass'n v. Sorrell, 272 F.3d 104, 109-10) (2d Cir. 2001)), Plaintiff also contends that the Ferry Law is "inconsistent with Congress' intent," (Pl.'s Post Trial Mem. p. 22), to deem ferry service as a means of marine transport to relieve road congestion.

   1) Disparate Impact

The sole evidence of disparate impact upon interstate commerce presented by Plaintiff was the testimony of Paul G. Forsberg, Sr. According to Mr. Forsberg, the fact that fast ferries cannot utilize the Montauk dock results in seasickness to his passengers and a loss of tourism on Block Island and in other ports to which he would bring additional passengers or commence new routes. All of this testimony was based upon Mr. Forsberg's "observations" and statements made to him by unidentified individuals at unknown times and under unspecified circumstances. In any event, the alleged impact upon interstate commerce was essentially an impact upon only Plaintiff's business as it operates the sole ferry terminal in the Town.[11] According to Mr. Forsberg, but for the Ferry Law, he would increase the speed and number and capacity of presently scheduled sailings and carry vehicles which would, in his opinion, effect cost containment, vanquish seasickness,

---

[11] It is somewhat ironic that Mr. Forsberg successfully sought to prevent competition to its operation within the Town, (Tr. 205), and now complains that Ferry Law inures only to his detriment.

support tourism in Block Island and save everyone utilizing his service time, money and discomfort. He had done no studies of potential passenger demand between the Town and his proposed ports and presented no data, expert opinion or even sworn testimony of Block Island proprietors to support his claims. And, insofar as he claimed to be disadvantaged due to the expense and time required to service his vessels in other states, he failed to quantify that claim as well. Thus, while Mr. Forsberg's testimony outlined the nature of his complaints, it did not indicate the extent, if any, or the legitimacy of his claims, see Pacific Nw Venison Producers v. Smith, 20 F.3d 1008 (9th Cir. 1994), which may therefore be characterized as "inconveniences" to his business. See National Tank Truck, 677 F.2d at 273-74 (one (1) hour additional travel time occasioned by regulation prohibiting truck transport of compressed gas through New York City not unconstitutional).

Mr. Forsberg's testimony regarding the effects of the Ferry Law on his costs was also unsubstantiated and his testimony regarding his intended expansion but for the Ferry legislation was entirely speculative. Indeed, Plaintiff failed to cite a single authority for the propositions that defendant should have analyzed the Viking operation prior to adoption of the Ferry Law, (Pl.'s Post Trial Mem. p. 4), or that a conceivably negative effect on a proposed expansion or change in an existing business model is a consideration pursuant to the Pike balancing equation.[12]

Nor has Plaintiff presented any legal basis for his conclusion that the impact of legislation

_____

[12] Notably, although Plaintiff blames the Ferry Law for his inability to reap greater economic benefit, he *sua sponte* reduced his passenger capacity to avoid Coast Guard "paperwork," (Tr. 285-86) or for "economic reasons" (Tr. 159), and retired or sold his vessels capable of exceeding the Ferry Law speed limit or carrying vehicles, prior to the implementation of the legislation. (Tr. 163.)

must be assessed in the light of an individual business. (See Pl.'s Post Trial Mem. p. 1 (stating that

"as applied to Viking, the Ferry Bans fail the Pike balancing test"); Id. at p. 2 (stating "[a]s applied

to Viking . . . the Ferry Bans fail to pass constitutional muster").) Indeed, while under certain

circumstances not present here, the Commerce Clause might conceivably be violated by disparate

impact upon only one company, see Wood Marine Serv. Inc. v. Board of Comm'rs. for E. Jefferson

Levee Dist., 653 F. Supp. 434 (E.D. La. 1986) (finding that the ban of limestone operation creates

only de minimis impact on interstate commerce where alternative sites on Mississippi River

available), the United States Supreme Court has held that the Commerce Clause is not necessarily

violated by legislation which affects some interstate companies or precludes a particular operation.

See Exxon Corp. v. Governor of Md., 437 U.S. 117, 127-28, 98 S. Ct. 2207, 57 L. Ed. 2d 91 437

U.S. 117 (1978) ("As indicated by the Court in [Hughes v. Alexandria Scrap Corp., 426 U.S. 794,

806, 96 S. Ct. 2488, 2496, 49 L. Ed. 2d 220 (1976)], the [Commerce] Clause protects the interstate

market, not particular interstate firms, from prohibitive or burdensome regulations . . . . "); see also

Kleenwell BioHazard Waste and Gen. Ecology Consultants, Inc. v. Nelson, 48 F.3d 391 (9th Cir.

1995); Chambers Med. Techs v. Bryant, 52 F.3d 1252 (4th Cir. 1995).

Indeed, even if Plaintiff decided to suspend his operation based upon the Ferry Law, that

decision would not require a finding that the Ferry Law constitutes an impermissible burden on

interstate commerce. See Exxon Corp., 437 U.S. at 127.

Most importantly, however, Mr. Forsberg conceded that the impact of the Ferry Law on

tourism was felt in East Hampton as well as Block Island and that residents of East Hampton are

equally burdened by the available ferry service. (Tr. 193, 207, 269, 272.) Thus, far from economic

protectionism or serving local interests, the Ferry Law provides no economic benefit to the Town

35

and does not encourage "Balkanization." (Pl.'s Post Tr. Mem. p. 24 (citing Hughes v. Oklahoma, 441 U.S. 322, 99 S. Ct. 1727, 60 L. Ed. 2d 250 (1979).)

Based upon the foregoing, Plaintiff failed to establish any disparate impact on interstate commerce occasioned by the Ferry Law.

2)    Commercial Activity Wholly Beyond the State's Borders

Plaintiff argues that the Ferry Law regulates commerce wholly outside New York (Pl.'s Post Trial Mem. pp. 20-21), based upon the premise that, "[b]y limiting the maximum installed horsepower and speed capacity of Viking's ferries, the Town regulates the speed of Viking ferries . . . even when they travel between two points that are both outside the State of New York . . . and precludes Viking's establishment of interstate ferry routes between places wholly outside of New York." (Id. at 20.)

The present Viking operation utilizes the Town as its base of operations. "[A] state statute will be invalid *per se* under the Commerce Clause if it has the practical effect of controlling commerce occurring wholly outside that State's borders." Freedom Holdings, 357 F.3d at 219 (citing Healy v. Beer Inst., 491 U.S. 324, 332, 109 S. Ct. 2491, 105 L. Ed. 2d 275 (1989)).

As in Freedom Holdings, the "practical effect" of the Town's Ferry Law

does not rise to the level of a constitutionally impermissible act. The effect does not constitute the 'regulati[on of] commerce,' Healy, 491 U.S. at 332, 109 S. Ct. 2491, 'control [of] commerce,' id. at 336, 109 S. Ct. 2491, 'projection of one state regulatory regime into the jurisdiction of another State,' id. at 337, 109 S. Ct. 2491, or 'application of a state statute to [extraterritorial] commerce.' id. at 336, 109 S. Ct. 2491, necessary to render a state statute invalid.

36

\* \* \*

"[T]he mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids." Osborn v. Ozlin, 310 U.S. 53, 62, 60 S. Ct. 758, 84 L. Ed. 1074 (1940); see also Healy, 491 U.S. at 345, 109 S. Ct. 2491 (Scalia, J., concurring in part and concurring in the judgment).

Freedom Holdings, 357 F.3d at 220-21.

Plaintiff has failed to demonstrate that the Ferry Law regulates commerce occurring wholly outside the State.

### 3) Inconsistent Regulatory Requirements

Plaintiff also contends that the Ferry Law creates an incidental burden upon interstate commerce by imposing a regulatory scheme which is inconsistent with regulations of other states. Plaintiff cites Raymond Motor Transp., 434 U.S. 429, and Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 79 S. Ct. 962, 3 L. Ed. 2d 1003 (1959), in support of this argument.

The plaintiffs in these cases were involved in interstate trucking utilizing the national road infrastructure, and challenged laws of jurisdictions through which they operated. Here Plaintiff is not required by other jurisdictions to operate fast or vehicle ferries; nor is the Town a connector route or bridge between two (2) out-of-state destinations.

Moreover, the holdings in both cases are limited to their facts. In Raymond, the Plaintiff challenged a Wisconsin statute that restricted operation of trucks over fifty-five (55) feet long and double trailer trucks on its interstate highways. At trial, the State presented no evidence of any

safety interest served by the law and the plaintiff presented "overwhelming empirical data" supporting its position. Raymond, 434 U.S. at 450. In addition, the law contained "a great number of exceptions" to the general rule, at least one of which favored Wisconsin industries over the industries of other states. Id. at 446. The United States Supreme Court noted the narrowness of its holding based upon the "overwhelmingly" one-sided evidence produced by the plaintiff and the failure of the State of Wisconsin "to make even a colorable showing that its regulations contribute to highway safety." Id. at 447-48.

Similarly, in Bibb, an Illinois statute which required particular mudguards on state highways directly conflicted with an Arkansas statute, rendering "use of the same motor vehicle equipment in both States impossible." 359 U.S. at 523. The Plaintiff in Bibb presented actual costs associated with the regulation and a "massive showing" of the burdens upon interstate commerce, which Illinois did not attempt to rebut. Id. at 528.

Here, Plaintiff presented no empirical, expert or otherwise confirmable evidence of its claim whereas Defendant presented a decade of studies and reports, as well as expert testimony, to support its enactment of the Ferry Law.

Moreover, and insofar as Plaintiff seeks to imply that the area of ferry transport is "a matter of national importance" requiring uniformity and approaching preemption, there was no evidence presented at trial to this effect, see, e.g., Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 80 S. Ct. 813, 4 L. Ed. 2d 852 (1960), and Plaintiff's post-trial submissions do not substantiate this claim.

Based upon the foregoing, Plaintiff failed to demonstrate that the Ferry Law is "inconsistent" with Congress' intent.

Plaintiff also cites C&A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 114 S. Ct. 1677, 128 L. Ed. 2d 399 (1994), for the proposition that, if similar regulations were imposed in other jurisdictions ferry service could be jeopardized as a means of interstate travel. (See Pl.'s Post Trial Memo. p. 22.) This hypothetical assessment is unsubstantiated and the ultimate "jeopardy" unexplained. See Huron, 362 U.S. 440 (No impermissible burden on interstate commerce where argument regarding competing or conflicting local regulations is unsubstantiated.)

Thus, Plaintiff has not proved that the Ferry Law

[is] inconsistent with the legitimate regulatory regimes of other states, see Healy, 491 U.S. at 336-37, 109 S. Ct. 2491, that [it] force[s] out-of-state merchants to seek New York regulatory approval before undertaking an out-of-state transaction, see id. at 337, 109 S. Ct. 2491, or that any sort of interstate regulatory gridlock would occur if 'many or every' state adopted similar legislation, see id. at 336, 339-40, 109 S. Ct. 2491. In short, none of the indicia of an impermissible extraterritorial regulation are present.

Freedom Holdings, 357 F.3d at 221. Based upon the foregoing, Plaintiff failed to prove any incidental burden upon interstate commerce, much less one which violates the Commerce Clause.

C.    Putative Benefit of the Ferry Law

In performing the Pike balancing test, the Supreme Court is "not inclined to second-guess the empirical judgments of lawmakers concerning the utility of legislation." CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 92, 107 S. Ct. 1637, 1651, 95 L. Ed. 2d 67 (1987) (citation and quotation marks omitted). The Pike balancing test "does not invite courts to second-guess legislatures by estimating the probable costs and benefits of the statute, nor is it within the competency of courts to do so." Brown & Williamson Tobacco Corp. v. Pataki, 320 F.3d 200, 209

(2d Cir. 2003). Rather, "the court must confine its analysis to the purposes the lawmakers had for maintaining the regulation," and "the only relevant evidence concerns whether the lawmakers could rationally have believed that the challenged regulation would foster those purposes." Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 680, 101 S. Ct.1309, 67 L. Ed. 2d 580 (1980) (Brennan, J. concurring) (citations omitted). Thus, if the regulation is not "wholly irrational in light of its purposes," it will be upheld. Id. at 680-81; see Brown & Williamson, 320 F.3d at 217 (finding that a statute would be upheld despite putative benefit of only a small number of cigarette sales to minors); see also Grand River Enters., 425 F.3d at 169 (finding sufficient that "the challenged statutes were plainly enacted with significant public interests in mind") (citation omitted); Ford Motor Co. v. Texas Dep't of Transp., 264 F.3d 493, 504 (5th Cir. 2001) (finding sufficient "evidence from which a reasonable legislator could believe [a law] would further the State's legitimate interest").

The deteriorating traffic conditions in the Town had been well documented over the decades preceding the Ferry Law.

The Town's enactment of the Ferry Law was responsive to the obvious and documented traffic congestion of the Town resulting from its desirability as a tourist destination and peculiar geography. Mr. Forsberg, a long-time Town resident, acknowledged the significant increase in vehicles on East Hampton roads during the summer, and that these traffic increases start earlier than Memorial Day and continue into November. (Tr. 205.) Indeed, in 2006, Plaintiff's website stated: "PLEASE PLEASE PLEASE (sic) allow enough time to get to Montauk and park your car. The summer traffic can be very heavy, [sic] it may take up to 90 minutes to get here from Southampton in heavy traffic." (www.vikingfleet.com.) The Second Circuit reviewing the

40

Southold record on appeal *de novo* noted the Town Board's concerns "with the resulting 'serious threat to public health and safety and to the economic vitality and general livability of the Town.'" Town of Southold, 477 F.3d at 43 (citation omitted).

The Town considered traffic conditions in the Town of Southold following expansion of vehicle ferry service and introduction of high-speed ferry service there, followed recommendations of the Transportation Element update to the Town Comprehensive Plan, and adopted the Ferry Law as part of an overall strategy to mitigate traffic.

The Transportation Element analyzed Town traffic patterns and volume and noted that "off-peak impacts may be greater than the peak conditions analyzed" because ferry traffic generated by a particular ferry departure during off-peak times "would represent a larger percent increase because the existing traffic volume is lower," thereby translating into a "great deterioration in level of service in the off-peak period than in the peak hour" studied. (Transportation Element p. 6-17.)

The Transportation Element analyzed a range of mitigation measures, and balanced the feasibility and implementation of those measures with public concerns for Town resources and quality of life in making its recommendations to the Town. (Tr. 415-19.)

Long Island planners and transportation officials determined that a bypass, considered at various points since the 1950's as a means of mitigating traffic congestion, was not feasible since Route 27, a state road, would require a right-of-way acquisition and construction which would be enormously expensive and require permission from the State. Moreover, wetlands and other sensitive areas rendered construction in certain places in the Town impossible; building bypass or alternate roads might invite additional traffic. (Tr. 533, 539.)

Although these facts alone support the Town's decision to adopt the Ferry Law, the Town

41

also amply demonstrated the connection between high-speed and vehicle ferry service, and increased traffic in the Town.

A vehicle ferry service would increase Town traffic at each arrival and departure by at least the number of cars that would be carried on that vehicle ferry up to two hundred eighty (280) cars per day at the height of summer if Viking ran four (4) round-trips per day, (Tr. 305) generating additional traffic on roads that already operate well below optimal levels of service.

As to high-speed ferries, faster travel time would, according to Mr. Forsberg, increase demand for the service, and he would increase ridership and thereby increase traffic to and from the terminal. (Tr. 65, 72-76, 135-37, 151, 156-57, 174-75, 167-168, 301, 303, 305-06.) Increasing traffic could debilitate the delivery of emergency services to Town residents. (Tr. 501.) Since institution of high-speed ferry service and vehicle ferry service would increase passenger demand and the associated traffic impacts, the Ferry Law fulfills its putative purpose of preventing further degradation of levels of service on Town roads.

Contrary to Plaintiff's contention, the trial evidence fails to establish that vehicle ferry service would improve Town traffic. The testimony of professional planner Lisa Liquori was to the contrary. (Tr. 518.) And Raymond DiBiase, the traffic engineer who drafted the Transportation Element, testified that he stands by his analysis and conclusions, including the recommendations that avoiding additional ferry service would avoid a further deterioration of levels of service and that the Town adopt regulations to prevent additional ferry services from being established to the Montauk area to prevent such deterioration. (Tr. 567-68, 583, 590-92, Transportation Element, pp. 6-22 to 6-24.)

D.    The 1999 Stipulation

The Second Circuit Court of Appeals remanded this case to the District Court solely for an

assessment of the Plaintiff's dormant Commerce Clause claim pursuant to the balancing test

outlined in Pike, 397 U.S. 137.  See Francarl, 239 F. App'x at 696-97.

Nevertheless, and despite the subsequent denial of Plaintiff's petition for rehearing or

rehearing en banc, (see Order dated October 15, 2007), Plaintiff maintains that the FPC, as

established in the 1999 Stipulation to settle state litigation with the Town, is an "entitlement" to

Plaintiff to transport the FPC number of one thousand three hundred and forty-two (1342)

passengers by any ferry and pursuant to any schedule it chooses.

Plaintiff is incorrect.

The 1999 Stipulation was an acknowledgment of a baseline for parking requirements at the

Francarl terminal. (See Mem. from Cynthia Ahlgren Shea, Town Attorney, to Fred Sellers, Chief

Building Inspector, dated Mar. 12, 1998 (stating that "Parking requirements for a ferry terminal are

based on 'ferry passenger capacity.'  In the event of (1) future proposals to expand the Viking Ferry

Services or (2) other proposed changes to the use at the Viking Marina site, it will be important

that the Town knows the existing ferry passenger capacity at the time of the adoption of  Local

Law 40 of 1997 (or during the previous summer ferry season), in order to establish a 'base-line' for

parking requirements") (emphasis added); see also Resolution 206, To Amend the Zoning Code of

Def.'s FPC, dated Feb. 9, 1999, (Ex. 118), pp. 2-3).)  Plaintiff admitted that he had never

transported more than one-half (½) the number of passengers of the FPC and had, for purposes of

increasing the FPC, operated empty vessels on the January date used to measure the FPC. (Tr.

43

385-86.) The FPC was also intended as a non-exclusive consideration in determining whether a ferry terminal had substantially expanded under the Town Code. See Town Code, Art. I, General Provisions, § 255-1-20.

Contrary to Plaintiff's contention, the FPC was not a recognition that Francarl could transport one thousand three hundred and forty-two (1342) passengers per day by other ferries or at times other than those regularly scheduled crossings which were factored into the FPC, including fast and vehicle ferries, or that it grandfathered fast or vehicle ferries for Viking.

Indeed, Plaintiff's claim is belied by several facts. First, the petition commencing the Article 78 proceeding, which the 1999 Stipulation settled, made no mention of fast or vehicle ferry service. (Ex. 120.) Moreover, the logical conclusion of this reasoning would shield any future ferry terminal from the fast and vehicle ferry proscriptions once a FPC had been established. See Town Code, Art. V, Special Permit Uses, § 255-5-50, Specific Standards and Safeguards, Ferry Terminal, Passenger (4). Nor was this theory raised in the Complaint in this case. And, although the Article 78 sought a determination that "[Viking's] lawful pre-existing ferry use includes the right to make an unlimited number of trips, departures or voyages," (Verified Pet. (Ex. 120), Wherefore Clause sub.(b)), that language was not included in the stipulation. Second, although the Ferry Law was adopted prior to the 1999 Stipulation, Plaintiff, represented by counsel, did not seek exemption from the Fast and Vehicle Ferry Bans in the 1999 Stipulation. Third, there is no evidence that the Town conducted additional traffic surveys prior to the Stipulation or that it intended to exempt Francarl from any requirements of the Zoning Law, except the requirement that it seek a special permit for its then existing traditional ferry transport services. As noted by Ms. Liquori, a change in any factor considered in establishing the FPC could trigger additional reviews.

44

(Tr. 324, 367, 371, 372.)

VI.    Conclusion

Plaintiff failed to establish any incidental burden created by the Ferry Law upon interstate commerce and the Town proved the benefits envisioned and realized by the Ferry Law, reasonably concluding that there were no feasible mitigation measures, alternatives or other means to alleviate traffic generated by ferry service with a lesser impact upon interstate commerce.

Therefore, a balancing of the Ferry Law's burdens and benefits shows no burden which is clearly excessive in relation to local benefits and no shifting of the costs of the Ferry Law to other jurisdictions. United Haulers., 438 F.3d at 160.

Based upon the foregoing, judgment is entered for the Defendant and the Complaint is dismissed.

**SO ORDERED.**

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated:    June 12, 2009
          Central Islip, New York