DIF

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
──────────────────────────────────X

FRANCARL REALTY CORPORATION,
VIKING STAR, INC., VIKING STARSHIP, INC.,
VIKING QUEST, INC., VIKING GOOD TIMES,
INC., PAUL G. FORSBERG, SR., HANK LACKNER,
GEORGE SHIMINSKI, WILLIAM J. MODICA,
STRETTLE F. WHOTTING, and WILLIAM GRIMM,

                Plaintiffs,

                -against-

THE TOWN OF EAST HAMPTON,

                Defendant.
──────────────────────────────────X

FILED
U.S. DISTRICT COURT E.D.N.Y.
★        ★
LONG ISLAND OFFICE

**OPINION & ORDER**
05-CV-1792 (SJF) (WDW)

FEUERSTEIN, J.

On April 11, 2005, plaintiffs Viking Star, Inc., Viking Starship, Inc., Viking Quest, Inc., Viking Good Times, Inc. (collectively, "Viking"); Paul G. Forsberg, Sr. ("Forsberg"), Hank Lackner, George Shiminski, William J. Modica, Strettle F. Whitting and William Grimm (collectively, "Individual Plaintiffs"); and Francarl Realty Corporation ("Francarl") commenced this action against defendant the Town of East Hampton (the "Town") claiming an undue burden on interstate commerce as a result of the Town's prohibitions on high speed and vehicle ferries (the "Fast Ferry Ban" and "Vehicle Ferry Ban," respectively). Presently before the Court are the parties' Memoranda of Law on Remand seeking a determination of whether the burden imposed on interstate commerce by the Fast Ferry Ban clearly exceeds the putative local benefits derived from the Ban. For the reasons discussed below, this Court holds that the fast ferries would cause additional traffic congestion, environmental nuisances, and safety hazards, and therefore, the

incidental burden on interstate commerce does not clearly exceed the putative local benefits of the Fast Ferry Ban.

I. Introduction

   A. Factual Background

The facts underlying this case are set forth in the Opinion and Order dated June 12, 2009 dismissing Plaintiffs' Complaint following a bench trial. See Francarl Realty Corp. v. Town of East Hampton, 628 F.Supp.2d 329 (E.D.N.Y. 2009). Therefore, the Court will presume familiarity with the relevant factual background in this case.

   B. The Ferry Law

In 1998, the Town adopted the Ferry Law, which became operative on January 13, 2008. The Ferry Law states, *inter alia*:

> A. Special Permit required. No person shall construct, commence to use, or substantially expand a passenger ferry terminal, nor commence any passenger ferry service, without having first obtained a special permit pursuant to Article V hereof which specifically authorizes the proposed use and approves the onshore terminal facility to be employed.
>
> B. Vessel limitations. No ferry which has more than two thousand (2,000) installed horsepower and the capability of traveling at a speed in excess of twenty (20) knots, nor any vehicle ferry of any description, shall dock at or otherwise make use of any passenger ferry terminal, or be allowed to dock at or make use of such facility, except in case of emergency.

The Ferry Law also "defined the capacity of passenger ferries serving East Hampton." (Pl/Def. 56.1 Stmt. ¶ 52). Pursuant to this authority, "the Town's Chief Building Inspector determined the total capacity of the Viking Ferries operating from Francarl's ferry terminal was 644 persons per day." ( Id. ¶ 53). After several appeals to the Town Zoning Board of Appeals and a 1999 amendment to the Ferry Law, (Cahn Aff., Ex. 38), the East Hampton Chief Building Inspector and, *inter alia*, the Viking Plaintiffs entered into a "written settlement stipulation in which they agreed to be bound by the Inspector's determination that the ferry passenger capacity of the Viking Ferries [operating out of the Ferry Terminal] is a total of 1342 persons per 24 hour day." (Pl/Def. 56.1 Stmt. ¶ 59).

B.  Procedural History

By Opinion and Order dated September 14, 2006 ("September 2006 Order"), this Court denied Plaintiffs' motion for summary judgment, granted the Town's cross-motion for summary judgment, and dismissed the instant action. Plaintiffs appealed to the Court of Appeals for the Second Circuit, and on September 7, 2007, the Second Circuit issued a Mandate (the "September 7, 2007 Mandate"), remanding this case for "further proceedings" on Plaintiffs' claim pursuant to the balancing test set out by the United States Supreme Court in Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). Francarl Realty Corp. v. Town of East Hampton, 239 F. App'x. 695, 697 (2d Cir. 2007). This Court held a bench trial from February 2, 2009 through February 4, 2009 to determine whether the Fast Ferry Ban and Vehicle Ferry Ban fail the Pike balancing test in accordance with the Second Circuit's September 7, 2007 Mandate. By

3

Opinion and Order dated June 12, 2009, this Court dismissed Plaintiffs' Complaint, holding that the Fast Ferry Ban and the Vehicle Ferry Ban did not violate the Commerce Clause of the United States Constitution pursuant to the balancing test set forth in Pike. See Francarl, 628 F.Supp.2d at 355. Specifically, this Court held that: (1) the Fast Ferry Ban and the Vehicle Ferry Ban did not place any incidental burden on interstate commerce; (2) the Fast Ferry Ban and the Vehicle Ferry Ban were responsive to the local problem of traffic congestion; and (3) a stipulation of settlement entered in a separate action in 1999 (the "1999 Stipulation") did not exempt Plaintiffs from the Fast Ferry Ban or Vehicle Ferry Ban. Id., at 352, 54-55. Plaintiffs appealed to the Second Circuit, and on May 3, 2010, the Second Circuit issued a Summary Order (the "Summary Order") remanding the case to this Court for a determination of:

> (1) whether, taking into account the stipulated limited passenger capacity, the Fast Ferry Ban serves to avoid additional traffic congestion; (2) whether, in view of the limitation on passengers already imposed on the plaintiffs, there are any other putative local benefits to be derived from the Fast Ferry Ban; and (3) whether, if there be any putative local benefits attributable to the Fast Ferry Ban, the incidental burden on interstate commerce clearly exceeds those benefits under the Pike balancing test.

Francarl Realty Corp. v. Town of East Hampton, No. 09-2817, 2010 WL 1740809, at *1 (2d Cir. May 3, 2010).[1]

---

[1] The Second Circuit "agree[d] with [this] Court's determination that 'vehicle' ferries would cause additional traffic congestion and, therefore, that the incidental burden on interstate commerce does not clearly exceed the putative local benefits of the Vehicle Ferry Ban." Francarl, 2010 WL 1740809, at *2.

II. Discussion

   A. Legal Standard

The Commerce Clause of the United States Constitution grants Congress the authority to "regulate Commerce . . . among the several States . . . . ." U.S. Const. Art. I, § 8, cl. 3. The Supreme Court has long held that the clause contains both an affirmative grant of power and a "further, negative command, known as the dormant Commerce Clause . . . that prevents a State from . . . placing burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." American Trucking Ass'ns v. Mich. PSC, 545 U.S. 429, 429, 125 S.Ct. 2419, 2422, 162 L.Ed.2d 407 (2005) (citations and quotation marks omitted).

In the September 7, 2007 Mandate, the Second Circuit "determined that 'the Ferry Law does not facially discriminate against interstate commerce . . . Nor is there evidence showing that the Ferry Law was enacted for the purpose of discriminating against out-of-state interests." Francarl, 239 F. App'x at 696. Accordingly, it directed this Court to utilize the balancing test set forth in Pike, under which a "law that only incidentally burdens interstate commerce . . . will be struck down if the burden imposed on interstate commerce clearly exceeds the putative local gains." Town of Southold v. Town of E. Hampton, 477 F.3d 38, 47 (2d Cir.2007).

A "party challenging a law as either clearly discriminatory or violative of Pike bears the threshold burden of demonstrating that it has a disparate impact on interstate commerce," and "'[t]he fact that it may otherwise affect commerce is not sufficient.'" Town of Southold, 477 F.3d at 47 (quoting Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc., 155 F.3d

59, 75 (2d Cir. 1998)). If the plaintiff meets their threshold burden, "the burden shifts to the government to show that the local benefits of the law outweigh its discriminatory effects and that the government lacked a nondiscriminatory alternative by which it could protect the local interests." Town of Southold, 477 F.3d at 47 (citing USA Recycling, Inc. v. Town of Babylon, 66 F.3d 1272, 1281-82 (1995), cert. denied, 517 U.S. 1150, 116 S.Ct. 1452, 134 L.Ed.2d 571 (1996)). If the plaintiff "cannot show discrimination, however, it must demonstrate that the law places a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits." Town of Southold, 477 F.3d at 47 (citations and internal quotations omitted). Pursuant to Pike, 397 U.S. 137,

> [w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

Pike, 397 U.S. at 142; see also Grand River Enterprises Six Nations, Ltd. v. Pryor, 425 F.3d 158, 169 (2d Cir. 2005) ("To apply this balancing test, we consider (1) the nature of the local benefits advanced by the statute; (2) the burden placed on interstate commerce by the statute; and (3) whether the burden is "clearly excessive" when weighed against these local benefits.") (citing Pike, 397 U.S. at 142). As the Second Circuit, in its Summary Order, held that this Court "erred in its determination that the Fast and Vehicle Ferry Bans effected no incidental burden on interstate commerce" and that the "Bans shift the burden of traffic from local drivers onto interstate travelers because local drivers benefit from reduced traffic volume on the local roads

while interstate travelers are denied the most direct route to the Town," this Court shall proceed directly to a determination of the putative local benefits to the Town. Francarl, 2010 WL 1740809, at *1.

B. The 1999 Stipulation

The Second Circuit has remanded this case so that this Court can determine "whether, taking into account the stipulated limited passenger capacity, the Fast Ferry Ban serves to avoid additional traffic congestion . . . ." Francarl, 2010 WL 1740809, at *1. However, although the Second Circuit found that "there is substantial evidence in the record that the plaintiff's transportation of 1,342 passengers per day - a number stipulated to by the Town in another context as the plaintiffs' ferry passenger capacity - would not cause an additional traffic burden" on the Town, id, the stipulated number of one thousand, three hundred forty-two (1,342) is not the appropriate passenger capacity to use when analyzing the putative local benefits to the Town pursuant to Pike.

As the Second Circuit noted, the 1999 Stipulation was entered into by the Town "in another context." Francarl, 2010 WL 1740809, at *1. Instead of establishing a number of passengers that Francarl could transport in one (1) day for all purposes, it merely acknowledged a "base-line" for parking requirements at the Francarl terminal. (See Mem. from Cynthia Ahlgren Shea, Town Attorney, to Fred Sellers, Chief Building Inspector, dated Mar. 12, 1998 (stating that "Parking requirements for a ferry terminal are based on 'ferry passenger capacity.' In the event of (1) future proposals to expand the Viking Ferry Services or (2) other proposed changes to the use

7

at the Viking Marina site, it will be important that the Town knows the existing ferry passenger capacity at the time of the adoption of Local Law 40 of 1997 (or during the previous summer ferry season), in order to establish a 'base-line' for parking requirements") (emphasis added)).

Indeed, at the time the 1999 Stipulation was signed by Plaintiffs, the Fast Ferry Ban had already been enacted, and thus it governed the 1999 Stipulation. (Trial Tr., Feb.2, 2009, at 217:1-4 (noting that the 1999 Stipulation was executed on November 18, 1999 and the Ferry Law was enacted in December 1997)). See also Norfolk and Western Ry. Co. v. American Train Dispatchers Ass'n, 499 U.S. 117, 130, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) (quoting Farmers and Merchants Bank of Monroe v. Federal Reserve Bank of Richmond, 262 U.S. 649, 660, 43 S.Ct. 651, 655, 67 L.Ed. 1157 (1923)) (noting that "laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms. This principle embraces alike those laws which affect its construction and those which affect its enforcement or discharge"); Icahn v. Todtman, Nachamie, Spizz & Johns, P.C., No. 99 Civ 11783, 2002 WL 362788, at *3 (S.D.N.Y. Mar. 2, 2002) (noting that "stipulations of settlement are essentially contracts and will be construed in accordance with contract principles")(quotations omitted). Moreover, Plaintiffs were aware of the Fast Ferry Ban's existence, and therefore, entered the 1999 Stipulation aware that they were not permitted to transport of the one thousand, three hundred forty-two (1,342) passengers by fast ferry. (Id., at 217:24 - 218:4 (wherein Forsberg, the principal of Francarl and Viking, answered affirmatively when asked: "[Y]ou knew when you authorized the execution of the agreement that that 1,342 number could not be made up of passengers on a fast ferry, because you couldn't run a fast ferry. Correct?")). Yet, even with this

knowledge, Plaintiffs did not seek or otherwise negotiate an exemption from the Fast Ferry Ban in the 1999 Stipulation. Therefore, Plaintiffs cannot claim that the 1999 Stipulation permits them to transport the passengers by fast ferries. See Oak Beverages v. Tomra of Massachusetts, L.L.C., 96 F. Supp.2d 336, 351 (S.D.N.Y. 2000) (noting that "res judicata will bar a second action by a defendant 'who is silent in the first action and then tries to bring a second action that would undermine the rights of interests established in the first action") (quoting Henry Modell & Co. v. Minister, Elders, and Deacons of the Reformed Protestant Dutch Church, 68 N.Y.2d 456, 461 (N.Y. 1986)). Accordingly, the 1999 Stipulation has no bearing on the passenger capacity in the context of the Fast Ferry Ban.

### C. Putative Local Benefits

The Second Circuit noted that "evidence that 'faster travel time would . . . increase demand for the [plaintiffs' ferry] service,' . . . alone is inadequate to establish the link between the Fast Ferry Ban and the putative benefit of mitigating traffic congestion," Francarl, 2010 WL 1740809, at *1, but an increase in demand for Plaintiffs' ferry services is not the only factor which would aggravate traffic congestion. Even assuming that the 1999 Stipulation is applicable and Plaintiffs could transport up to one thousand three hundred forty-two (1,342) passengers in one day, the Fast Ferry Ban nevertheless serves to regulate traffic congestion in the Town.

The Transportation Element commissioned by the Town in 1997 and re-adopted in 2005 studied the level of service on the roads surrounding the ferry terminal, and found that ferry arrivals and departures cause "deterioration of service" at up to five (5) intersections in the area.

(Tr., at 562-63.) Fast ferries would allow Plaintiffs to make additional trips to current destinations, as well as make trips to new destinations. (Tr. 147-75, 303, 305-06). These additional trips would cause vehicles to arrive at and depart from the ferry terminal more frequently throughout any given day. (Tr., at 567: 12-14 (noting that if the ferries ran more frequently, "the traffic would . . . be generated at more times a day")). As the "level of service at [an] intersection is dependent on the critical moment[,] [a]nd that critical moment most typically is a vehicle entering the main road from a side road," (Tr., at 569), additional ferry departures and arrivals, or larger capacity vessels depositing more passengers at the dock, and requiring additional transport vehicles would decrease the level of service on the Town's roadways more frequently, or to a greater extent, throughout the day, even if the overall twenty-four (24) hour passenger capacity of one thousand three hundred forty-two (1,342) remained in effect. The Fast Ferry Ban, by preventing such an increase in trips, benefits the Town by stabilizing the level of service on the Town's Roads.

An increase in traffic in the Town would "lower the average speeds [of vehicles], usually . . . resulting in an increase of emissions" such as carbon monoxide. (Transportation Element, at 6-9). Moreover, "[m]ore vehicular noise is generated by acceleration and deceleration [in traffic] than by travel at constant speeds. Acceleration noise includes that generated by gear changes; tire and brake noise occur when vehicles decelerate." (Id., at 6-9 - 6-10.) Increased traffic congestion could reasonably be expected to delay deliveries of food, other perishables, and supplies to the Town, as well delay emergency service vehicles to and from the Town. (Tr., at 501.) Thus, the Fast Ferry Ban not only benefits the Town by preventing an increase in traffic congestion, but it also benefits the Town by decreasing the occurrence of nuisances and safety

hazards generally attributable to increased traffic.

The Fast Ferry Ban further operates to create a safer atmosphere within the Town. Fast ferries would render the Town more easily accessible as a vacation destination for visitors from New England. (Transportation Element, at 6-12.) This "potential for increases in pedestrian, bicycle, and moped activity" in the Town "may pose safety concerns, since residents have already identified speeding vehicles and poor bicycle riding conditions as perceived problems." (Id.) Additionally, fast ferries would cause larger wakes than traditional ferries when accelerating and decelerating outside of the Town's waters. (DE 69, Att. #8.). These wakes could potentially endanger boaters and kayakers within the Town's waters. (Id.) Accordingly, it is evident that the Fast Ferry Ban provides putative local benefits to the Town outside of traffic regulation.

D. Pike Balancing Test

As this Court has found that putative local benefits can be attributed to the Fast Ferry Ban, it must, as the Circuit directed, determine whether the "incidental burden on interstate commerce clearly exceeds those benefits under the Pike balancing test." Francarl, 2010 WL 1740809, at *1. The Second Circuit described the incidental burden on interstate commerce as shifting "the burden of traffic from local drivers onto interstate travelers because local drivers benefit from reduced traffic volume on the local roads while interstate travelers are denied the most direct route to the Town." Id. However, ninety-two percent (92%) of the traffic arriving in the Town originates from locations in Nassau County, Suffolk County, New York City, Westchester County, and New Jersey. (Tr., at 518.) Travelers from those areas are unlikely to

11

drive to Connecticut to board a ferry to the Town, (id.), and therefore, the Fast Ferry Ban does not burden their travel. Only eight percent (8%) of travelers arriving in the Town depart from New England. (Id.) Even if Plaintiffs were permitted to institute fast ferry service to its intended locations in New England, (see Tr., at 136), the fast ferry service would merely save the New England travelers less than one (1) hour per trip. (Id., at 174). Thus the relative burden on interstate commerce is minimal. See USA Baseball v. City of New York, 509 F.Supp.2d 285, 303 (S.D.N.Y. 2007) (noting that the "cancellation of some out-of-state games that comprise a relatively small portion of the schedule for New York City teams" would constitute a "minimal burden on interstate commerce").

When performing the Pike analysis, a Court should not be "inclined to second-guess the empirical judgment of lawmakers concerning the utility of legislation." CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 92, 107 S.Ct. 1637, 1651, 95 L.Ed.2d 67 (1987) (citation and quotation marks omitted). See also Brown & Williamson Tobacco Corp. v. Pataki, 320 F.3d 200, 209 (2d Cir.2003) (noting that the Pike balancing test "does not invite courts to second-guess legislatures by estimating the probable costs and benefits of the statute, nor is it within the competency of courts to do so"). Rather, "the court must confine its analysis to the purposes the lawmakers had for maintaining the regulation," and "the only relevant evidence concerns whether the lawmakers could rationally have believed that the challenged regulation would foster those purposes." Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 680, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981) (Brennan, J. concurring) (citations omitted). Thus, if the regulation is not "wholly irrational in light of its purposes," it will be upheld. Id. at 680-81, 101 S.Ct. 1309. As previously discussed, the Town has demonstrated that it receives numerous

benefits from the Fast Ferry Ban, which was enacted in response to the documented problems stemming from the increase of traffic in the area. Accordingly, the minimal burden on interstate commerce is not "'clearly excessive' when weighed against these local benefits." Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 169 (2d Cir.2005) (quoting Pike, 397 U.S. at 142, 90 S.Ct. 844)). See also Brown & Williamson, 320 F.3d at 217 (holding that "because the Statute has only de minimis effects on interstate commerce, the prevention of even this small percentage of cigarette sales to minors constitutes a putative local benefit that is sufficient to survive the Pike balancing test"); USA Baseball, 509 F.Supp.2d 285, 303 (S.D.N.Y. 2007) ("In light of the minimal burden on interstate commerce that would result [from an ordinance], no rational jury could find that the burden imposed was 'clearly excessive' relative to the local benefit.")

III.  Conclusion

For the reasons discussed above, this Court finds that a balancing of the Fast Ferry Ban's burdens and benefits shows that the burden on interstate commerce is not clearly excessive in relation to local benefits. Pursuant to the Second Circuit's directives in the Summary Order, "this case should be restored to [the Second Circuit] pursuant to the procedure outlined in United States v. Jacobson, 15 F.3d 19, 22 (2d Cir.1994)." Francarl, 2010 WL 1740809, at *2.

**SO ORDERED.**

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: September 17, 2010
       Central Islip, New York